Rose Ann BROWN, Petitioner–Appellant,

v.

Anginell ANDREWS, Superintendent of Albion Correctional Facility, Respondent–Appellee.

Docket No. 98–2717.

United States Court of Appeals, Second Circuit.

Argued April 23, 1999.

Decided June 8, 1999.

Richard M. Greenberg, Office of Appellate Defender, New York, N.Y. (Joseph M. Nursey, of counsel), for Petitioner–Appellant.

Archibald F. Robertson, Jr., Asst. Atty. Gen. of State of New York, New York, NY, for Elliot L. Spitzer, Attorney General (John W. McConnell, Deputy Solicitor General, and Robert A. Forte, Asst. Atty. Gen., on the brief), for Respondent–Appellee.

Before: KEARSE and CALABRESI, Circuit Judges, and HAIGHT, District Judge.*

CALABRESI, Circuit Judge:

Petitioner-appellant Rose Brown appeals from a judgment of the United States District Court for the Southern District of New York (Loretta A. Preska, *Judge*) dated June 8, 1998. The district court rejected the recommendation of the magistrate judge and denied Brown's 28 U.S.C. § 2254 habeas corpus petition through which Brown sought to overturn her state narcotics conviction. Brown contends that her Sixth Amendment right to a public trial, as incorporated by the Fourteenth

---

* The Honorable Charles S. Haight, Jr., United States District Judge for the Southern District of New York, sitting by designation.

Amendment, was violated by the closure of her state trial during the testimony of an undercover officer who allegedly purchased drugs from her. We conclude that the State did not offer a sufficient justification to close Brown's trial to the public, and we therefore reverse the district court.

## BACKGROUND

On January 30, 1990, Brown was approached by Tony Fisher, an undercover officer of the New York City Police Department's Manhattan North Narcotics Division, as part of a "buy and bust" operation. Brown sold $10 of crack cocaine to Fisher. Fisher then contacted other officers, who subsequently arrested Brown.

At Brown's state court trial, held later in 1990, the State presented three witnesses. One was a police chemist who tested the substance that Fisher had purchased from Brown and determined that it was crack. The second was the officer who arrested Brown, but who did not see the "buy" from Brown by Fisher. The third witness was Fisher, whose testimony was obviously crucial to the State's case since he was the only one submitting evidence that Brown had actually sold crack.

The State asked that the courtroom be closed during Fisher's testimony. At a closure hearing, Fisher explained that he had "about 100[to] 150" open narcotics cases pending, and that in some of those cases the suspects had not yet been arrested. Accordingly, in two previous trials in which he was involved, Fisher had testified in a closed courtroom. Fisher stated his concern that testifying in open court would jeopardize his safety:

> The reason why I feel that way is because I'm an undercover police officer. I'm going to remain an undercover police officer for an unknown period of time. If the courtroom is open, my identity will be, would be—won't be concealed. Everybody would know who I am. I still work in Manhattan. I work in my—I have a family. My family and I, we visit relatives who live throughout the City, and I don't want my identity to be known because I fear for my safety.

Fisher also testified that people from whom he had bought drugs often threatened him during the buys.

Following the closure hearing, the trial court ordered that the courtroom be closed during Fisher's testimony, stating:

> [T]he court is of the opinion that there is a realistic threat ... to the officer's safety, based on the fact that he is still operational out on the streets of Manhattan and that on a day to day basis he is active, and that his testimony in open court will constitute a danger to his safety. The full parameters of that danger really can't be measured, but if there's any realistic possibility I think the Court has to operate on the side of safety. Based on the officer's testimony that he would indeed feel threatened physically, and that he still has cases pending and constantly in process, the Court grants the prosecution's motion to have this [testimony] held without the public being present.

Brown was convicted. Her conviction was affirmed on direct appeal. *See People v. Brown,* 178 A.D.2d 280, 577 N.Y.S.2d 380 (1st Dep't 1991). Leave to appeal was denied by the New York Court of Appeals. *See People v. Brown,* 79 N.Y.2d 918, 582 N.Y.S.2d 78, 590 N.E.2d 1206 (1992). In 1994, Brown filed this § 2254 petition. She argued (1) that Officer Fisher's testimony should have been open to the public, and (2) that the trial court should have *sua sponte* considered making an exception to its order to allow her father to watch Fisher testify.

The magistrate judge (Andrew J. Peck, *M.J.*) recommended that the writ be granted. He reasoned that Fisher's generalized concerns for his safety were not enough to justify the closure of the courtroom, and therefore that Brown's Sixth Amendment right to a public trial had been violated. At that point, Brown's case was put on hold to await the resolution of a closely related issue in *Ayala v. Speckard,* 131 F.3d 62 (2d Cir.1997) (in banc) ("*Ayala III*"), *cert. denied* —— U.S. ——, 118 S.Ct. 2380, 141 L.Ed.2d 747 (1998). Following

*Ayala III*, the magistrate judge renewed his recommendation that Brown's petition be granted.

The district court rejected the magistrate's report and denied the writ. Although the court found that "the testimony here was not geographically specific" enough to support the closure of the trial on the ground that Fisher's undercover effectiveness would be compromised, the court concluded that the officer had been specific enough with respect to his safety concerns to justify closure. In the district court's view: "It does not make any sense to require an officer who lives under this fear to utter specific talismanic phrases such as 'and I return to the area where I arrested the defendant' or 'and I think that some of the people who can identify me are in this Courthouse' prior to ordering closure." The district court also held that, following *Ayala III*, a trial court was not required *sua sponte* to ask defendants if they wanted family members to remain in the face of an order to close the courtroom.[1]

■ Brown now appeals.[2]

## DISCUSSION

■ We review a district court's decision on a habeas petition *de novo. See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996). The Sixth Amendment guarantees defendants in criminal cases the right to a "public" trial. In *Waller v. Georgia*, 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the Supreme Court stated that closure of a criminal proceeding to the public was only justified if the following factors were met: "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader

than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] [the court] must make findings adequate to support the closure."

The issue in this case is whether the State met the first prong of the *Waller* test. In *Ayala III*, we stated that prong one of *Waller* required "persuasive evidence of serious risk to an important interest." *See Ayala III*, 131 F.3d at 70. Two such interests are advanced in defense of the closure in this trial: (1) the undercover officer's effectiveness, and (2) the undercover officer's safety.

The effectiveness and safety interests are both analytically and practically distinct. *See Brown v. Kuhlmann*, 142 F.3d 529, 537–38 (2d Cir.1998). For example, an officer who has completed all undercover duties will not have his or her effectiveness undermined by testifying in a prior case, but that officer may nonetheless face serious threats to his or her physical wellbeing if his or her identity becomes known. On the other hand, an undercover officer's effectiveness could be seriously impaired by public testimony even in the absence of any safety concerns. As a result, the resolution of this case requires us to determine whether the evidence proffered by the State was enough to justify closure under either of these two separate interests.

■ The State contends that Fisher's effectiveness as an undercover officer would have been diminished if his identity had been revealed at Brown's trial. The district court correctly rejected this argument. Our decisions demonstrate that, where the only asserted risk to the undercover officer's effectiveness is that the officer would return to an area of operation, where trial audience members might re-

---

1. Since we conclude that the state trial court erred by closing the courtroom during Fisher's testimony, we need not address the issue of whether an exception should have been made, *sua sponte*, for Brown's father. *But see Ayala III*, 131 F.3d at 71–72 (stating that trial judges had no obligation to consider making exception for family members *sua sponte* ).

2. According to representations made at oral argument, Brown has completed both her state prison sentence and her period of supervised release. Because she brought habeas corpus while incarcerated and her conviction, if it stands, entails significant negative consequences, her suit avoids both statutory and constitutional mootness. *See Wheel v. Robinson*, 34 F.3d 60, 63 (2d Cir.1994).

side, that area must be defined with geographic particularity. *See Kuhlmann,* 142 F.3d at 537; *Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994). In this case, Fisher testified only that he would become known in Manhattan if he testified in open court.[3] An entire borough of New York City is simply not a specific enough location to support the conclusion that people in a place where Fisher would actually work were likely to see his testimony and thereby blow Fisher's cover as a police officer.

■ The State's second interest in closing the trial was grounded in Fisher's safety concerns. Safety concerns may be supported by factors other than an officer's future return to the same area of operation. In *Kuhlmann,* we stated that an officer's safety concern, based on his having "several cases pending in the Manhattan courts where [the] trial was taking place," *see Kuhlmann,* 142 F.3d at 537, was enough to justify closure of a trial even though his concerns were not geographically specific enough to support closure on an effectiveness basis, *see id.* at 537–38. Since threats to an officer's safety have no necessary geographic limitations, it would be both unwise and dangerous to require geographic specificity in the safety context.

■ The district court relied on our language in *Kuhlmann* that referred to "the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose," *see id.* at 537 (citation omitted), in reaching its conclusion that an officer's general concern for his or her safety is sufficient to meet prong one of *Waller. Kuhlmann,* however, involved a very minor closure, as the testimony of the undercover agent in that case was brief and cumulative. *See id.* at 538. Indeed, we stated quite clearly in *Kuhlmann* that:

Our holding that the courtroom closure here was not error ... turns in large measure on the significance of the testimony during the closure itself. Specifically, *this case did not involve the classic courtroom closure during the testimony of an undercover police officer who was a party to a buy-and bust drug transaction with the defendant.* In such a case, the prosecution invariably centers around this witness: the undercover officer who purchased the drugs provides the only testimony as to the defendant's identity as the seller. The only additional testimony is provided by the arresting officer and, in some cases, a police chemist. While [the officer] happened to have been an undercover officer when he testified, *this case did not involve a drug transaction with the petitioner, nor did his testimony directly relate to the criminal activity for which petitioner was charged.* ... Under these circumstances, ... the closure did not violate the Public Trial Clause.

*Id.* at 534 (emphases added) (internal quotation marks and citation omitted).

Unlike *Kuhlmann,* this case *does* concern precisely the drug transaction between an undercover officer and the petitioner for which the petitioner was charged. On the other hand, the safety concerns expressed by Officer Fisher in this case are probably greater than those presented in the *Kuhlmann* case; here Fisher stated that he had 100 to 150 open cases, whereas the officer in *Kuhlmann* only mentioned "several cases." We must, therefore, focus on what safety evidence needs to be offered by the State to support closure in a core "buy and bust" case like the one before us.

The State must demonstrate a specific connection between the perceived threat to the officer and the officer's public testimo-

---

**3.** One might infer that Fisher was only referring to the northern half of Manhattan since he worked in the North Manhattan Narcotics Division. But inferences such as this should not be drawn in this context, *see infra,* and we therefore express no view on whether the northern half of Manhattan is geographically specific enough to justify closure.

ny in the particular proceeding. *Cf. Ayala v. Speckard,* 89 F.3d 91, 95 (2d Cir.1996) (*"Ayala I "*), *vacated on other grounds,* 131 F.3d 62 (2d Cir.1997) (in banc) ("Although [the officer] testified that he was fearful for his safety should he be required to testify in open court, he did not state any particularized fear resulting from testifying [at the] trial.").

■ This particularity requirement is met, for example, if the State credibly asserts (1) a reasonable relationship between the danger to the officer and the presence in court of associates of the defendant, (2) a plausible fear arising from the officer's testimony in the proceedings in question, in view of the existence of other pending proceedings concerning parties with whom the officer is also involved as an undercover agent, so long as those proceedings are in the same courthouse, or (3) a specific threat to the officer by a particular person or group that may not be involved in current court proceedings but who would be aided in the carrying out of their threat by the officer's open testimony.

Thus, if a defendant was a member of a gang or group that had sworn vengeance against police officers who testified against them, then a court would be justified in closing the trial during the undercover officer's testimony on the assumption that those confederates might attend the trial and thereby discover who the police officer was. A similar conclusion could be reached if there was a reasonable relationship between the officer's testimony and other cases involving the officer that were pending (at either trial, pre-trial proceedings, or grand jury investigations) in the courthouse in which the trial was being held. Finally, specific threats made against the officer by any person who could attend the trial, even if that person was otherwise unconnected with the courthouse proceedings, might justify closure in the "buy and bust" context.

■ The burden of particularity imposed by such requirements is not meant to be a heavy one. But it is a burden that clearly rests with the State. The Public Trial Clause of the Sixth Amendment is an express constitutional right. And the Supreme Court, in *Waller,* while permitting exceptions to public trials, leaves no doubt as to who must show that these exceptions apply. Accordingly, it is up to the State to articulate facts that establish the relationship between the perceived threat to the undercover officer and the proceeding in which the testimony is sought. And, precisely because the burden is a relatively light one and the facts on which the relationship to be demonstrated is based are normally in the State's possession, it is inappropriate for courts to substitute speculation or conjecture for data.

We believe that, in the case before us, the State did not offer particularized facts to support closure. The State does not contend that petitioner was part of a gang or group that threatened police officers. It offers no evidence with respect to the threats made against Fisher, other than the suggestion that Fisher, like most people who buy drugs on the street, felt endangered by dealers. The State's main contention, instead, is that, because Fisher had many open drug cases at the time that his testimony was sought, there was a substantial possibility that a suspect from one of those cases might see Fisher's public testimony.

This may well be, but without more specificity it is not enough to overcome Brown's Sixth Amendment right. Fisher offered no information on how many—if any—of his cases were pending in the courthouse where he was to testify. His statement is consistent with his cases being primarily in other courthouses or not in court at all. There is, moreover, no suggestion in the record that Fisher took any steps to conceal his identity when he entered the courthouse. Yet, evidence of whether Fisher had cases pending in the courthouse at the time of Brown's trial could easily have been produced by the

State. And, similarly, Fisher could readily have indicated what other measures he had taken to avoid being seen in that courthouse. Such testimony would have both substantiated his fear and avoided the need for surmise as to the likelihood that his public testimony at Brown's trial might result in his identification by other suspects whom he had encountered in his undercover work.

In the end, all Fisher stated was (1) that he had many open drug cases somewhere, (2) that as a result of testifying he might be identified by drug suspects, and (3) that he was afraid of what would happen if his identity was disclosed. But this describes virtually *every* undercover officer's situation in drug cases. If the testimony provided by Fisher were sufficient to close a trial even in a core "buy and bust" case, then the Sixth Amendment's guarantee of a public trial would not apply as to virtually any testimony involving undercover officers. Given the relative ease with which the State can proffer more, we are not prepared so to hold.

We conclude that the State did not offer sufficiently "persuasive evidence of serious risk to an important interest," as is required under prong one of *Waller* to justify closing Brown's trial, *see Ayala III*, 131 F.3d at 70, and that her conviction therefore cannot stand. The judgment of the district court is reversed and the writ of habeas corpus is granted.[4]

4. Even when a Public Trial Clause violation has been found, there may be circumstances where granting a writ of habeas corpus may nonetheless be inappropriate. *Waller* required, *inter alia*, that the state trial court make adequate findings to support the closure; and in other circumstances, the proper course might be to remand for a reconstructive hearing to fill in gaps in the record. In this case, however, the trial court stated its findings in support of its decision, and we do not see that reconstruction is necessary. Further, since the defendant has already finished her term in jail, and since no plausible indications of stategic manipulation with respect to the original raising of the objection to closure exist, we believe that the principles of redressability announced in *Kuhlmann*, 142 F.3d 542, do not, in this case, preclude habeas relief.