In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1096

KATHLEEN A. BRAUN,

Petitioner-Appellee,

v.

BARBARA POWELL,

Respondent-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 97 C 423--Lynn Adelman, Judge.

Argued June 7, 2000--Decided September 18, 2000

Before POSNER, COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.  Kathleen Braun was convicted of murder in 1976. While her motion for a new trial was pending, she escaped from prison. After her return to custody in 1984, she filed a motion in Wisconsin state court to vacate the judgment of conviction. The Wisconsin circuit court denied her motion. The Court of Appeals of Wisconsin affirmed; the Supreme Court of Wisconsin then granted review and affirmed. Ms. Braun later filed a petition for federal habeas corpus relief; the district court granted the petition. For the reasons set forth in the following opinion, we reverse the judgment of the district court.

I
BACKGROUND

Kathleen Braun was arrested in 1975 and charged with the murder of William Weber. The primary witness against Ms. Braun was Earl Jeffrey Seymour. Seymour also had been arrested for Weber's murder; he testified against Ms. Braun pursuant to a plea agreement. A jury convicted Ms. Braun in December 1976 after a six-week trial, and she was sentenced to life imprisonment.

During the trial, the trial judge excluded from the courtroom a man named Mr. Mane. Mane had been

a member of the jury venire panel but had been excused because he had said that he was friendly to the defense. After he had been excused, he returned to the courtroom to watch the trial. The trial court then excluded Mane from the courtroom, stating that it had a policy of excluding all former members of the venire panel from remaining in the courtroom during the trial.

In August 1977, Ms. Braun filed a post-conviction motion under Wisconsin Statutes sec. 974.02./1 In December, before the trial court could rule on the sec. 974.02 motion, Ms. Braun escaped from prison. In May 1978, the trial court dismissed Ms. Braun's motion on the ground that she had escaped from prison.

Ms. Braun was involuntarily returned to custody in 1984. In 1988, she filed a Motion to Vacate Judgment pursuant to Wisconsin Statutes sec. 974.06./2 Ms. Braun argued that the trial court had violated her Sixth Amendment right to a public trial by excluding Mane. She also contended that the prosecutor had committed misconduct by not disclosing fully the terms of the plea agreement under which Seymour testified and, further, that the failure to disclose the full terms of the plea agreement infringed on her constitutional right to cross-examine witnesses.

The trial court denied her motion. The Court of Appeals of Wisconsin affirmed. See State v. Braun, 504 N.W.2d 118 (Wis. Ct. App. 1993). The Supreme Court of Wisconsin granted review in the case and also affirmed. See State v. Braun, 516 N.W.2d 740 (Wis. 1994). The Supreme Court of Wisconsin did not reach the merits of Ms. Braun's Sixth Amendment and prosecutorial misconduct claims. Instead, it held that she was precluded from bringing a motion under sec. 974.06 because, by her escape, she had "forfeited all claims she either raised or could have raised" in the earlier post-conviction motion under sec. 974.02. Id. at 745.

Subsequently, Ms. Braun brought a petition for habeas corpus in the district court. The court granted the petition. See Braun v. Powell, 77 F. Supp.2d 973 (E.D. Wis. 1999). The court first held that Ms. Braun's escape had not caused an abandonment of her constitutional claims. Addressing the merits of those claims, the court held that the exclusion of Mane had violated Ms. Braun's right to a public trial and that such a violation required the issuance of the writ of habeas corpus. The court also determined that prosecutorial misconduct had occurred in violation of the Constitution, but that the violation was harmless; similarly, it found harmless any unconstitutional restriction on Ms.

Braun's ability to cross-examine witnesses.

## II
## DISCUSSION
### A.  Procedural Default

We review de novo the district court's holding that Ms. Braun did not commit procedural default during the state court proceedings. See Franklin v. Gilmore, 188 F.3d 877, 882 (7th Cir. 1999), cert. denied, 120 S. Ct. 1535 (2000); Fields v. Calderon, 125 F.3d 757, 759-60 (9th Cir. 1997); Couch v. Jabe, 951 F.2d 94, 96 (6th Cir. 1991) (per curiam). In a federal habeas corpus proceeding, we look to state law to determine whether a claim has been defaulted. See Thomas v. McCaughtry, 201 F.3d 995, 1000 (7th Cir. 2000); Turentine v. Miller, 80 F.3d 222, 224 (7th Cir. 1996). If the state court declined to reach the merits of the petitioner's claim because of a procedural default, that default must constitute an independent and adequate state-law ground in order to be a bar to federal habeas relief. See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Schaff v. Snyder, 190 F.3d 513, 524 (7th Cir. 1999).

### 1.

To conclude that the procedural default constitutes an independent basis for the state court's ruling, we must be convinced that the last state court to consider the question actually relied on procedural default as the basis for its decision. See Willis v. Aiken, 8 F.3d 556, 561 (7th Cir. 1993); Prihoda v. McCaughtry, 910 F.2d 1379, 1382 (7th Cir. 1990). The state court therefore must have "clearly and expressly" relied on procedural default as the basis of its ruling. Harris v. Reed, 489 U.S. 255, 263 (1989) (quotation marks omitted); Jenkins v. Nelson, 157 F.3d 485, 491 (7th Cir. 1998), cert. denied, 119 S. Ct. 2402 (1999); Rose v. Lane, 910 F.2d 400, 402 (7th Cir. 1990). The independence of the ground of procedural default is not at issue in this case. The Supreme Court of Wisconsin unambiguously based its holding on its view that Ms. Braun's escape constituted an abandonment of her right to bring an appeal. Ms. Braun does not argue that procedural default was not an independent basis for the state court's ruling.

### 2.

To be an adequate ground of decision, the state's procedural rule must be both "firmly established and regularly followed." Ford v. Georgia, 498 U.S. 411, 423-24 (1991) (quoting James v. Kentucky, 466 U.S. 341, 348 (1984));

Franklin, 188 F.3d at 882; Rosa v. Peters, 36 F.3d 625, 633 (7th Cir. 1993). A procedural ground is not adequate, however, unless it is applied in a "consistent and principled way"; it cannot be employed "infrequently, unexpectedly, or freakishly." Thomas, 201 F.3d at 1000; Bobo v. Kolb, 969 F.2d 391, 399 (7th Cir. 1992) (quotation marks omitted); Prihoda, 910 F.2d at 1383. A state procedural rule is not an adequate ground for finding default if the prisoner "could not fairly be deemed to have been apprised of its existence" at the time she acted. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 457 (1958); Moore, 148 F.3d at 709 (quoting NAACP).

We must now consider whether procedural default was an adequate basis for the state court's ruling in this case. This task is complicated significantly by changes in the jurisprudence of Wisconsin. The earlier precedent of this court also must guide our inquiry.

After her conviction, Ms. Braun moved for post-conviction relief under sec. 974.02, but the trial court dismissed the motion because of her escape while the motion was pending. She did not appeal that dismissal. We must consider the effect of Ms. Braun's failure to appeal under Wisconsin law as it existed at the time of Ms. Braun's escape. Specifically, we must determine whether her failure to appeal that dismissal automatically foreclosed a later collateral attack under sec. 974.06 raising her constitutional claims. As we shall discuss more fully in the paragraphs that follow, we must conclude that the ruling of the Supreme Court of Wisconsin is not an adequate ground upon which to preclude federal habeas review.

a.

Initially, we examine the procedure that a prisoner normally would have followed, at the time of Ms. Braun's conviction, in order to challenge her conviction in the Wisconsin state courts. After conviction, the prisoner's first challenge would have been a motion under sec. 974.02. The sec. 974.02 motion would have been considered by the state trial court. If the trial court denied the motion, the prisoner could have appealed to the Court of Appeals of Wisconsin and, if necessary, to the Supreme Court of Wisconsin. These appeals would have constituted the prisoner's direct appeal. After the completion of the direct appeal, the prisoner then could have filed a collateral challenge under sec. 974.06. The prisoner first would have filed a sec. 974.06 motion in the trial court. If relief was denied in that court, the prisoner would, once again, have the opportunity to appeal

to the Court of Appeals of Wisconsin and then the Supreme Court of Wisconsin.

Ms. Braun, because of her escape, did not follow this procedure. She escaped while her sec. 974.02 motion was pending in the state trial court. When that motion was dismissed, Ms. Braun, still an escapee, did not appeal to the Court of Appeals. Following her recapture, she filed a sec. 974.06 motion with the trial court. After that sec. 974.06 motion was denied, she appealed to the Court of Appeals of Wisconsin and then to the Supreme Court of Wisconsin. As we have noted, the Supreme Court of Wisconsin held that Ms. Braun could not bring these post-conviction claims because her escape from prison and subsequent fugitive status had constituted a forfeiture of relief. When those challenges were unsuccessful, she filed her habeas petition in federal court.

We first consider in detail the implications of Ms. Braun's failure to take an appeal from the dismissal of her sec. 974.02 motion for a new trial. Because Ms. Braun failed to take an appeal from that dismissal, she never presented her arguments to the Court of Appeals of Wisconsin or to the Supreme Court of Wisconsin.

Putting aside for the moment her escape while the motion was pending in the state trial court, it is quite clear that, at that time, the failure to raise issues of constitutional magnitude on direct appeal did not prevent those issues from being raised in a later collateral attack. In Bergenthal v. State, 242 N.W.2d 199 (Wis. 1976), the Supreme Court of Wisconsin considered the merits of a prisoner's constitutional claim under sec. 974.06. The prisoner had taken a direct appeal to the Supreme Court but, in that direct appeal, had not raised one of the issues addressed in his sec. 974.06 motion: a claim that the government unconstitutionally had suppressed evidence. See Brady v. Maryland, 373 U.S. 83 (1963). Later, the prisoner brought an action under sec. 974.06, raised the Brady issue, and, in due course, brought it to the Supreme Court of Wisconsin. The Supreme Court of Wisconsin held that "[e]ven though the issue might properly have been raised on appeal, it presents an issue of significant constitutional proportions and, therefore, must be considered in this motion for postconviction relief." Bergenthal, 242 N.W.2d at 203. Thus, after Bergenthal, a constitutional claim not raised on direct appeal could be raised in a collateral attack under sec. 974.06.

The Supreme Court of Wisconsin's holding in Bergenthal remained the governing rule in Wisconsin until 1994. In that year, however, the Supreme Court of Wisconsin explicitly overruled

Bergenthal, and held that an issue must be raised on direct appeal in order to be considered on a motion under sec. 974.06. See State v. Escalona-Naranjo, 517 N.W.2d 157, 162 (Wis. 1994) ("We now overrule the holding in Bergenthal which stated that although a defendant fails to raise a constitutional issue on appeal, the issue still must be considered when raised in a subsequent sec. 974.06 motion."). Escalona-Naranjo was a companion case to Ms. Braun's sec. 974.06 case; the two cases were decided by the Supreme Court on the same day. Notably, the Justices relied on Escalona-Naranjo in deciding Ms. Braun's case. See Braun, 516 N.W.2d at 745 (citing Escalona-Naranjo).

At the time Ms. Braun abandoned her direct appeal, Bergenthal was the governing rule in Wisconsin. Therefore, Ms. Braun was entitled to conclude that a constitutional issue not raised on direct appeal could be brought later through a motion under sec. 974.06. Consequently, as this court already has made explicit, the rule of Escalona-Naranjo cannot be the ground of a procedural default for purposes of barring federal habeas review when the state post-trial motion was filed after Bergenthal but before Escalona-Naranjo. See Liegakos v. Cooke, 106 F.3d 1381, 1385 (7th Cir. 1997) ("[T]he doctrine of Escalona-Naranjo is not an 'adequate' state ground for appeals briefed before its announcement."); see also Liegakos v. Cooke, 108 F.3d 144, 145 (7th Cir. 1997) (on petition for rehearing) (per curiam) ("Our opinion holds that prisoners whose direct appeals came after Bergenthal v. State, but before Escalona-Naranjo, are entitled to raise constitutional arguments in federal court under 28 U.S.C. sec. 2254 without justifying their omission from the briefs on direct appeal." (citation omitted)). Thus, the rule of Escalona-Naranjo does not render Ms. Braun in procedural default.

The State points out that, after the trial court rejected her sec. 974.02 motion, Ms. Braun not only failed to raise these arguments to the Court of Appeals of Wisconsin and to the Supreme Court of Wisconsin, but she failed to take any direct appeal on any issue to those tribunals. We do not believe, however, that this distinction is a significant one. Prior to Bergenthal, the Supreme Court of Wisconsin had held that "[m]erely because a direct appeal was not taken does not mean that a 974.06 motion cannot be made later." State v. Loop, 222 N.W.2d 694, 696 (Wis. 1974). The court made clear, however, that the only issues that could be raised under sec. 974.06 after being abandoned on direct appeal were those of constitutional magnitude. Indeed, Loop specifically held that exhaustion on direct

appeal was not required before bringing a constitutional claim under sec. 974.06./3 Thus, under the rationale in Loop, Ms. Braun's failure to take any appeal does not, by itself, operate as a procedural bar to her later claims.

The State also contends that Ms. Braun's motion under sec. 974.06 must be regarded as an improper attempt to relitigate claims already decided. It submits that, because the state trial court ruled against Ms. Braun in its disposition of the motion under sec. 974.02, that her claims have been decided on the merits, and therefore could not be relitigated in any subsequent proceeding under sec. 974.06.

The State is correct that, at the time of Ms. Braun's escape, issues actually raised in a direct appeal could not be relitigated on a sec. 974.06 motion. The Supreme Court of Wisconsin had held that "[t]he motion [under sec. 974.06] must not be used to raise issues disposed of by a previous appeal." Peterson, 195 N.W.2d at 845; see also Smith v. State, 217 N.W.2d 257, 258 n.6 (Wis. 1974) (quoting Peterson)./4 It appears, however, that the Supreme Court of Wisconsin applied this rule only when the issues had been presented to the appellate courts. The result in Bergenthal demonstrates that the Peterson bar applied only when the denial of the post-trial motion for a new trial was actually appealed. In Bergenthal, the trial court reached the merits of the petitioner's Brady claim in adjudicating the post-trial motion for a new trial. See Bergenthal, 242 N.W.2d at 202 (describing trial court's resolution of post-trial motion). Nonetheless, the petitioner was able to bring his constitutional claim on a later sec. 974.06 motion; the Supreme Court of Wisconsin did not consider Peterson a bar to its review. We must conclude that, at the time of Ms. Braun's escape, Wisconsin would permit constitutional claims raised in a motion under sec. 974.02 to be relitigated on a sec. 974.06 motion when the earlier sec. 974.02 motion had not been scrutinized by the appellate courts. Because Ms. Braun did not bring a direct appeal, but instead abandoned her appeal after the trial court denied her motion for a new trial, the Peterson bar would not have applied to her constitutional claim. Her sec. 974.06 motion therefore cannot be characterized as an improper attempt to relitigate claims already decided./5

In summary, Ms. Braun's failure to raise her constitutional claims in a direct appeal does not, standing alone, foreclose the opportunity to raise those claims in a later motion under sec. 974.06. Her sec. 974.06 motion was not an improper attempt to relitigate matters already

decided.

b.

Although, in the usual situation at the time of Ms. Braun's escape, the failure to perfect a direct appeal did not foreclose a later collateral attack, we also must consider whether the nature of Ms. Braun's failure to appeal--her escape from prison--affects her ability to bring a later motion under sec. 974.06. In many American jurisdictions, "[d]isposition by dismissal of pending appeals of escaped prisoners is a longstanding and established principle of American law." Estelle v. Dorrough, 420 U.S. 534, 537 (1975). This "fugitive disentitlement" doctrine, when clearly applied by a state, may be an independent and adequate state procedural ground for finding default. See Wood v. Hall, 130 F.3d 373, 377-78 (9th Cir. 1997); Schleeper v. Groose, 36 F.3d 735, 736-37 (8th Cir. 1994); Feigley v. Fulcomer, 833 F.2d 29, 30 (3d Cir. 1987). Although Wisconsin appears to have adopted a broader version of this doctrine in its review of Ms. Braun's case, our task, in determining whether there has been a procedural default that bars federal habeas review, is to determine whether Wisconsin had a clear fugitive disentitlement doctrine at the time of Ms. Braun's escape. Specifically, we must determine whether it was clear in December 1977 that a prisoner escaping during the pendency of her motion under sec. 974.02 would recognize that she had abandoned her right to later bring a collateral attack under sec. 974.06.

The critical case in our inquiry is State v. John, 211 N.W.2d 463 (Wis. 1973). The parties agree that John was the Supreme Court of Wisconsin's only discussion of the fugitive disentitlement doctrine prior to Ms. Braun's escape. The appeal in John arose in a slightly different procedural posture than Ms. Braun's. In that case, John had pleaded guilty to aggravated battery, but then filed a motion for postconviction relief under sec. 974.06. The trial court scheduled a hearing on that motion, but at the time of the hearing, was informed that John had escaped. Even though he was not in the custody of the State of Wisconsin, John brought an appeal.

The Supreme Court of Wisconsin, in deciding John, acknowledged that the American courts applying the fugitive disentitlement doctrine had relied upon several different rationales to justify its invocation. It noted that some courts had grounded the doctrine on a waiver theory; others had relied on a mootness theory; some on an abandonment theory. Having surveyed these

approaches, the Supreme Court of Wisconsin then wrote that its use of the doctrine in John would rest on "a narrower ground and perhaps a stronger one." 211 N.W.2d at 465. Summarizing its holding, it wrote:

When a convict escapes and puts himself in a position where he cannot aid the court which needs his testimony in the determination of his petition, he has frustrated the administration of justice, made it impossible for the court to consider his petition, and has abandoned his application for relief on the merits.

211 N.W.2d at 466.

The decision of the Supreme Court of Wisconsin to ground the fugitive disentitlement doctrine on such a narrow ground, especially when it specifically acknowledged that broader bases existed, renders the doctrine an ineffective foundation for use as an adequate state ground to bar federal habeas relief in a case such as this one. A prisoner escaping from Wisconsin custody in 1977 was not on notice that failure to prosecute a motion for relief under sec. 974.02 would result in the loss of the right to later bring a motion for relief under sec. 974.06. The prisoner would be on notice that Wisconsin had limited its fugitive disentitlement doctrine to apply only in cases where the absence of the prisoner prevented the court from receiving from that prisoner information necessary to the adjudication of the matter before the court. Ms. Braun therefore would not have been given notice, as required by our case law, that her escape would preclude her later filing a sec. 974.06 motion.

B.  Merits

Because we have concluded that the State may not rely upon an adequate and independent state ground, we, like our colleague in the district court, must address the merits of the habeas petition. The petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore the standard of review contained in that Act governs Ms. Braun's claims. See Lindh v. Murphy, 521 U.S. 320, 322-23, 335, 336 (1997). As amended by AEDPA, the federal habeas statute now allows federal courts to grant habeas relief only if the state courts' denial of relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. sec. 2254(d). This

standard only applies, however, to a "claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. sec. 2254(d). In this case, the Supreme Court of Wisconsin disposed of Ms. Braun's claims without having reached the merits. Therefore, we cannot characterize these claims as having been adjudicated on the merits by the state court. Accordingly, we shall not employ the standard of review set forth in AEDPA but, rather, must rely upon the general standard as set forth in 28 U.S.C. sec. 2243. See Moore v. Parke, 148 F.3d 705, 708 (7th Cir. 1998). This standard requires us to "dispose of the matter as law and justice require." 28 U.S.C. sec. 2243.

1.

Ms. Braun contends that her right to a public trial, as guaranteed by the Sixth Amendment and made applicable to the states through the Fourteenth Amendment, see Gannett Co. v. DePasquale, 443 U.S. 368, 379 (1979), was violated by the state trial judge's exclusion of Mane from the courtroom. This individual had been a member of the jury venire and, after he was not chosen to sit as a juror, he sought to remain in the courtroom to watch the proceedings. The trial judge excluded him from the courtroom on the ground that the judge had a policy of not permitting persons who had served on the venire from remaining in the courtroom.

It has long been established that the Sixth Amendment right to a public trial is for the protection of the accused. See Waller v. Georgia, 467 U.S. 39, 46 (1984); Estes v. State of Texas, 381 U.S. 532, 538 (1965). Determining with any precision the contours of this right is a difficult task. Existing case law, although setting the outer boundaries, gives comparatively little guidance with respect to "gray areas." Precedents reversing convictions on the ground that the public trial right was violated generally deal with more substantial exclusions than the one at bar. Typically, when habeas relief was granted or a new trial required, the courtroom was totally closed to the general public at some critical juncture in the proceedings; or, in other cases, the court excluded a friend or relative of the defendant, in contravention of the Supreme Court's requirement, announced in In re Oliver, 333 U.S. 257, 271-72 (1948), that such individuals be allowed in the courtroom./6
In determining the contours of the right to a public trial, our colleagues in the other circuits also have recognized that there are certain instances in which the exclusion cannot be characterized properly as implicating the constitutional guarantee. Several cases have held

that the exclusion of spectators from a trial simply did not rise to the level of a constitutional violation. See Gonzalez v. Quinones, 211 F.3d 735, 737 (2d Cir. 2000) (court officer locked courtroom doors, without knowledge of the trial judge, during the testimony of two witnesses); United States v. Al-Smadi, 15 F.3d 153, 154-55 (10th Cir. 1994) (defendant's wife and child unable to enter courtroom when trial continued 20 minutes past the closing of the federal building in which the courtroom was located); Snyder v. Coiner, 510 F.2d 224, 230 (4th Cir. 1975) (courtroom locked for a short time without knowledge of trial judge during arguments of counsel before the jury). Judge Calabresi, writing for the Second Circuit, has explained succinctly how identifying those cases in which the circumstances do not implicate the constitutional guarantee differs from a harmless error analysis:

A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury." It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant--whether otherwise innocent or guilty--of the protections conferred by the Sixth Amendment.

Peterson v. Williams, 85 F.3d 39, 42 (2d Cir. 1996).

Given the many factual circumstances that a court must analyze in assessing whether the closure at issue in a particular case is one that implicates the constitutional guarantee of a public trial, the methodology employed by the trial court must be the focal point of appellate review. Here, Peterson suggests a thoughtful and helpful approach. The court distilled from the Supreme Court's decision in Waller four reasons that animate the right to a public trial:

1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury.

Id. at 43.

As the Second Circuit acknowledged, the case before it was an easy one for disposition in light of these factors, and the court had little difficulty in determining that no violation of the right to a public trial had occurred. The

court acknowledged that some minimal exclusions had taken place, but noted that the closure of the courtroom was "1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent." Id. at 44. Our case involves a closer situation. The exclusion was permanent, at least as to the one individual involved, and it was intentional on the part of the trial judge. On the other hand, the fact that the exclusion applied only to one person, not a relative or friend/7 of the defendant's, is not without significance in assessing the values protected by the right to a public trial.

When we turn to those values articulated in Peterson, we must conclude that we do not believe that they are implicated in any substantial way by the exclusion of Mane. There is no reason to believe that Ms. Braun's trial was any less fair, or that the court officers or witnesses took their roles any less seriously, because of the exclusion of this one spectator. Indeed, the exclusion was implemented, albeit mistakenly from what appears in this record, by the trial court to avoid any prejudice to the defendant. Moreover, although the record gives no justification for such action on the part of the trial judge, it is difficult to see any basis for attributing any significant detriment to the integrity of the trial proceedings to it. Mane's presence or absence from the trial does not appear to have had any effect on encouraging witnesses to come forward or on discouraging perjury. His sole connection with this case was that he had been a member of the jury venire and had driven the defense counsel on one occasion in his taxi cab.

In this six-week trial, this exclusion of a sole individual without any significant connection to the case or to the parties and on the apparently mistaken belief that such an exclusion would enhance, not detract, from the integrity of the proceedings, does not implicate the policy concerns that inform the Sixth Amendment's right to an open trial./8

We caution that the exclusion of any spectator runs the risk of violating the Sixth Amendment and, accordingly, of requiring a new trial. However, on the narrow facts presented here, we are convinced that any effect on Ms. Braun's trial did not rise to the level of a Sixth Amendment violation./9

2.

The district court decided that the prosecutor committed misconduct by failing to inform the jury of the terms of the State's plea agreement

with Seymour, the cooperating witness. As a consequence, the district court continued, the prosecutor misled the jury with respect to the circumstances under which Seymour was testifying. The prosecutor did not tell the jury that Seymour had been informed that the prosecutor would, after hearing Seymour's testimony, reevaluate its sentencing recommendation for Seymour. The terms of Seymour's plea agreement properly could have been used for impeachment purposes./10 Because the terms of the plea agreement were favorable to the defense in the sense that they could have been used for impeachment, the prosecutor had a duty to disclose those terms to Ms. Braun. See Strickler v. Greene, 527 U.S. 263, 280 (1999) (stating that the Government's duty to disclose favorable evidence "encompasses impeachment evidence as well as exculpatory evidence"); Giglio, 405 U.S. at 153-54. The prosecutor should have disclosed to the defense that Seymour knew the State would be evaluating his testimony and thereafter recommending a sentence based, in part, on how effectively he testified against Ms. Braun. Moreover, in addressing the jury and in offering Seymour as its witness, the prosecution, by not disclosing the agreed-upon reevaluation, created a misimpression of the terms of plea agreement.

Nonetheless, like the district court, we cannot say that, on this record, the evidence was material. In cases where the prosecutor withholds exculpatory evidence, such as a plea agreement, the Supreme Court of the United States has instructed that "[s]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Strickler, 527 U.S. at 280 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)); see also Schaff, 190 F.3d at 527 n.13 (quoting Strickler). However, when the prosecutor knowingly relies on false testimony, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); see also Schaff, 190 F.3d at 530 (quoting Agurs). The Agurs standard is different from that in Bagley and sets a lower threshold for determining materiality./11

Here, under either standard, we do not think that the Government's failure to take the proper action can reasonably be viewed as having affected the jury. Therefore, under either standard for materiality, the error was not fatal. First, it is apparent that the information withheld by the prosecutor was heard by the jury. Although the prosecutor failed to inform the jury of Seymour's plea agreement, Seymour himself

testified about the nature of the agreement. As the district court wrote:

The prosecutor's lack of candor was mitigated by the fact that Seymour, during his testimony, made two statements to the jury suggesting that the incarceration recommendation was not cast in stone. On direct examination he testified that the "District Attorney's office said that they would take into consideration everything that I have done since the murder to the time of sentencing and make whatever recommendation they feel appropriate at that sentencing." (Tr. at 1432.) And on cross-examination he again testified that at the sentencing the district attorney was free to make "whatever recommendation he felt was proper." (Tr. at 1632.)

R.34 at 53. Thus, the jury was aware that Seymour had a specific incentive to testify favorably in the hope of further reducing his sentence. Further, as the district court found, cross-examination of Seymour drew out "other evidence regarding Seymour's self-interest in testifying against [Ms. Braun]." Id. at 55. Seymour was cross-examined for approximately a week, and the jury heard extensive evidence demonstrating his lack of credibility.

In short, we do not believe that the prosecution's conduct had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Conclusion

For the foregoing reasons, the judgment of the district court is reversed.

REVERSED

/1 The text of sec. 974.02 provides:

(1)   A motion for postconviction relief other than under s. 974.06 by the defendant in a criminal case shall be made in the time and manner provided in ss. 809.30 and 809.40. An appeal by the defendant in a criminal case from a judgment of conviction or from an order denying a postconviction motion or from both shall be taken in the time and manner provided in ss. 808.04(3), 809.30 and 809.40. An appeal of an order or judgment on habeas corpus remanding to custody a prisoner committed for trial under s. 970.03 shall be taken under ss. 808.03(2) and 809.50, with notice to the attorney general and the

district attorney and opportunity for them to be heard.

(2) An appellant is not required to file a postconviction motion in the trial court prior to an appeal if the grounds are sufficiency of the evidence or issues previously raised.
Wis. Stat. Ann. sec. 974.02.

/2 The text of sec. 974.06 provides:

(1) After the time for appeal or postconviction remedy provided in s. 974.02 has expired, a prisoner in custody under sentence of a court or a person convicted and placed with a volunteers in probation program under s. 973.11 claiming the right to be released upon the ground that the sentence was imposed in violation of the U.S. constitution or the constitution or laws of this state, that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

(2) A motion for such relief is a part of the original criminal action, is not a separate proceeding and may be made at any time. The supreme court may prescribe the form of the motion.

(3) Unless the motion and the files and records of the action conclusively show that the person is entitled to no relief, the court shall:

(a) Cause a copy of the notice to be served upon the district attorney who shall file a written response within the time prescribed by the court.

(b) If it appears that counsel is necessary and if the defendant claims or appears to be indigent, refer the person to the state public defender for an indigency determination and appointment of counsel under ch. 977.

(c) Grant a prompt hearing.

(d) Determine the issues and make findings of fact and conclusions of law. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or is otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the person as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the person or resentence him or her or

grant a new trial or correct the sentence as may appear appropriate.

(4) All grounds for relief available to a person under this section must be raised in his or her original, supplemental or amended motion. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the person has taken to secure relief may not be the basis for a subsequent motion, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental or amended motion.

(5) A court may entertain and determine such motion without requiring the production of the prisoner at the hearing. The motion may be heard under s. 807.13.

(6) Proceedings under this section shall be considered civil in nature, and the burden of proof shall be upon the person.

(7) An appeal may be taken from the order entered on the motion as from a final judgment.

(8) A petition for a writ of habeas corpus or an action seeking that remedy in behalf of a person who is authorized to apply for relief by motion under this section shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced the person, or that the court has denied the person relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his or her detention.

Wis. Stat. Ann. sec. 974.06.

/3 Prior to Loop, in Peterson v. State, 195 N.W.2d 837 (Wis. 1972), the Supreme Court of Wisconsin had held that exhaustion normally would be required before a sec. 974.06 motion could be brought:

The postconviction motion under sec. 974.06, Stats., is not a substitute for a motion for a new trial. A sec. 974.06 motion can be made only after the defendant has exhausted his direct remedies which consist of a motion for a new trial and appeal.

Id. at 845; see also State v. Smith, 198 N.W.2d 630, 631-32 (Wis. 1972) (quoting Peterson). However, this exhaustion requirement did not apply to constitutional claims. In Loop, the

Supreme Court of Wisconsin clarified that Peterson did not preclude a defendant from raising in a sec. 974.06 motion a constitutional issue that could have been raised on direct appeal.

/4 We note that the cases cited by the State for the proposition that claims may not be relitigated under sec. 974.06 are cases that postdate Ms. Braun's escape. Thus, their holdings could not operate to put Ms. Braun in default because she could not be aware of them at the time of her escape. See Beamon v. State, 286 N.W.2d 592, 595 (Wis. 1980); see also State v. Brown, 291 N.W.2d 528, 531 (Wis. 1980) (quoting Beamon).

/5 The parties dispute whether the prosecutorial misconduct claim raised here by Ms. Braun was raised in her initial motion under sec. 974.02 in the state trial court. The State argues that the prosecutorial misconduct claim here is identical to that earlier claim and, thus, that Ms. Braun is improperly attempting to relitigate it. We have shown that, even if it is the same claim, the fact that it was identical to the earlier claim would not preclude its inclusion in the later sec. 974.06 motion.

/6 See Bell v. Jarvis, 198 F.3d 432, 437-42 (4th Cir. 2000) (habeas relief necessary when courtroom was closed to all but "family members and friends of the prosecutrix" during "empaneling of the jury, the court's introductory statements to the jury, the attorneys' opening statements, and the testimony of the prosecutrix"); Brown v. Andrews, 180 F.3d 403, 404-09 (2d Cir. 1999) (granting habeas relief because trial court closed courtroom for testimony of police officer); Guzman v. Scully, 80 F.3d 772, 773-77 (2d Cir. 1996) (habeas relief necessary when court excluded four spectators from cross-examination of prosecution witness, including two women either relatives or friends of the defendant); Vidal v. Williams, 31 F.3d 67, 69 (2d Cir. 1993) (writ granted after court excluded defendant's parents from testimony of police officer); Davis v. Reynolds, 890 F.2d 1105, 1108-11 (10th Cir. 1989) (granting habeas relief when court had "cleared the courtroom" during a preliminary hearing); Rovinsky v. McKaskle, 722 F.2d 197, 198-202 (5th Cir. 1984) (habeas appropriate when state trial court held motion hearing in camera); United States ex rel. Bennett v. Rundle, 419 F.2d 599, 603 (3d Cir. 1969) (exclusion of "all persons other than [the defendant], the attorneys, the witnesses and court officials"); Lewis v. Peyton, 352 F.2d 791, 791-92 (4th Cir. 1965) (writ granted when testimony of prosecutrix was taken at her home without entry of court order); United States v.

Kobli, 172 F.2d 919, 922-24 (3d Cir. 1949) (reversing for new trial because of "the general indiscriminate exclusion of the public from the trial"); Davis v. United States, 247 F. 394, 394 (8th Cir. 1917) (courtroom "cleared of all spectators except relatives of the defendants, members of the bar, and newspaper reporters, and a bailiff at the door was instructed to admit none but those of the excepted classes"); Kelly v. Meachum, 950 F. Supp. 461, 467-68 (D. Conn. 1996) (granting habeas relief when witness' cross-examination was closed to public); Ip v. Henderson, 710 F. Supp. 915, 916-20 (S.D.N.Y.) (when "trial judge closed the courtroom during the testimony of a government witness," habeas relief necessary), aff'd, 888 F.2d 1376 (2d Cir. 1989); Santos v. Brown, 596 F. Supp. 214, 215-19 (D.R.I. 1984) (writ granted when, "[d]uring the testimony of the complaining witness, the trial judge excluded spectators from the courtroom over the objection of the defense attorney and without an evidentiary hearing"); Sirratt v. State, 398 S.W.2d 63, 63-67 (Ark. 1966) (reversing conviction when courtroom was "cleared of all spectators"); Thompson v. People, 399 P.2d 776 (Colo. 1965) (en banc) (requiring new trial when district court excluded all but relatives, officials, and attorneys); State v. Ortiz, 981 P.2d 1127, 1138-39 (Haw. 1999) (new trial necessary when trial was closed "to all of Ortiz's family members"); State v. Lawrence, 167 N.W.2d 912, 913-19 (Iowa 1969) (reversing conviction when the public was entirely excluded during the reading of jury instructions); Commonwealth v. Marshall, 253 N.E.2d 333, 335 (Mass. 1969) (court excluded "defendant's relatives and friend"); State v. Schmit, 139 N.W.2d 800, 807 (Minn. 1966) (court allowed only "members of the bar and press" to watch trial); State v. Klem, 438 N.W.2d 798, 799-803 (N.D. 1989) (remanding for new trial when, during one witness' testimony, court was cleared of "all persons except court personnel, parties, attorneys, jurors, and a 'representative of the public media'"); People v. Kan, 574 N.E.2d 1042, 1043-45 (N.Y. 1991) (new trial necessary when courtroom was closed "to all spectators," including defendant's family, "during the testimony of the cooperating accomplice and of the two undercover police officers"); Addy v. State, 849 S.W.2d 425, 429 (Tex. Ct. App. 1993) (exclusion of "appellant's friends"); State ex rel. Stevens v. Circuit Court, 414 N.W.2d 832, 837 (Wis. 1987) (court "only allow[ed] news media attendance").

/7 The Supreme Court has held that defendants have a right to the presence of their friends in court. See Oliver, 333 U.S. at 271-72 ("[W]ithout exception all courts have held that an accused is

at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."). However, at Ms. Braun's trial, her counsel specifically disavowed any relationship between the defense and Mane:

THE COURT:  . . . I do remember particularly the State putting something on the record with respect to Mr. Mane.

MR. LOWE [Assistant District Attorney]:  Yes, we did.

THE COURT:  And with respect to [Mane's] friendship with counsel for the defense and later in meeting the people--the defendant and others.

MR. SHELLOW [counsel for Ms. Braun]:  One moment, friendship with counsel for the defense? He apparently conveyed me in his taxicab on one occasion.

THE COURT:  Well, he said he was a friend of yours.

MR. SHELLOW:  I don't think he was.

THE COURT:  He said he knew you and anyone that knows you is a friend of yours.

Tr. 48 at 1111-12.

/8 We also note the analysis of the Court of Appeals for the Fifth Circuit, in a case where the trial court excluded some members of the general public:

In this case, some members of the public were admitted; the courtroom was at least three-fourths full; the transcript of the trial became public record. Particularly important is the fact that the news media were admitted. The published reports of the trial were lengthy and complete. The defendant's relatives and clergymen were present to provide moral support and comfort to the accused. In sum, we find none of the secrecy of the proceedings which are condemned by the Sixth Amendment and In re Oliver, 333 U.S. 257 (1948) . . . . We conclude that the denial of one's right to a public trial is not at issue where "[t]here was no in camera or secret trial. [The trial] was held in a public courtroom with attorneys, court reporters, court attendants and at least some outsiders present." . . . "Certainly under modern conditions, when friends of the accused, the representatives of the press, and those necessary to the proper conduct of the trial are present, the defendant receives every safeguard insured by a trial open to the general

public."

Aaron v. Capps, 507 F.2d 685, 687-88 (5th Cir. 1975) (citations omitted).

/9 Because we hold that there was no violation of Ms. Braun's right to a public trial, we need not determine whether, consistent with Teague v. Lane, 489 U.S. 288 (1989), the "no harmless error" rule of Waller may be applied retroactively in a federal habeas proceeding.

/10 See, e.g., Giglio v. United States, 405 U.S. 150, 155 (1972) (holding that key witness' credibility was "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"); United States v. Scroggins, 939 F.2d 416, 421 (7th Cir. 1991) (describing the terms of a prosecution witness' plea agreement as "obvious impeachment material").

/11 Other circuits have also explained the difference between the Bagley standard and the Agurs standard. See United States v. Gambino, 59 F.3d 353, 364-65 (2d Cir. 1995) (finding that although a Brady violation occurred, the prosecutor did not rely on perjury, and thus "the lower standard of materiality is not triggered"); Gilday v. Callahan, 59 F.3d 257, 268 (1st Cir. 1995) (explaining that "in the non-perjury setting, all that is required or appropriate is the one-step Bagley inquiry into reasonable probability," but that "a prosecutor's knowing use of false testimony presents a different analytical situation"); United States v. Duke, 50 F.3d 571, 577 (8th Cir. 1995) (describing the difference in standards); United States v. Alzate, 47 F.3d 1103, 1109-10 (11th Cir. 1995) (noting the Bagley standard and explaining that "[a] different and more defense-friendly standard of materiality applies where the prosecutor knowingly used perjured testimony"); Fitzpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993) (observing that "different standards of materiality apply to Brady claims and claims that the prosecution has knowingly used perjured testimony or false evidence" and describing the standard for the latter as "considerably less onerous"); United States v. O'Dell, 805 F.2d 637, 641 (6th Cir. 1986) (acknowledging the difference in the standards).