**Geraldo SOTO, Petitioner,**

v.

**Edward REYNOLDS, Superintendent, Mohawk Correctional Facility, et ano., Respondents.**

**No. 98 Civ. 6743 LAK.**

United States District Court,
S.D. New York.

Sept. 13, 1999.

Lawrence T. Hausman, the Legal Aid Society, Criminal Appeals Bureau, for petitioner.

Efrem Z. Fischer, Assistant Attorney General, Eliot Spitzer, Attorney General of the State of New York, for respondents.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Petitioner, Geraldo Soto, seeks a writ of habeas corpus, alleging that closure of the courtroom during certain pre-trial and trial proceedings in the state court violated his Sixth and Fourteenth Amendment right to a public trial.

### Facts

The facts of the case are undisputed. Petitioner was arrested on August 27, 1993, near 10th Avenue and 48th Street during a "buy and bust" operation. That night, two undercover officers, Detectives Kissane and Durkin, were working near Hell's Kitchen Park. After watching petitioner several times reach into a paper bag, pass a plastic bag containing white rocks to an individual, and then accept something in return from the individual, the officers followed petitioner. As he left the area, he tossed a paper bag on the ground, which Kissane retrieved and found contained forty-five bags of crack cocaine. Durkin arrested petitioner, who was charged in New York Supreme Court with third degree criminal possession of a controlled substance.

Before trial, petitioner sought to suppress certain evidence against him. The People moved to close the suppression hearing to the public. On May 13, 1994, prior to the start of the suppression hearing, the suppression court held a *Hinton*[1] hearing to determine whether closure of the courtroom was permissible.

---

1. *See People v. Hinton,* 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (1972).

Detective Durkin testified at the *Hinton* hearing. He described his assignment to Manhattan South TNT, the Tactical Narcotics Team,[2] and his work in the area south of 59th Street from the east side to the west side.[3] At the time of the hearing, Durkin had been an undercover officer for three months[4] and a "permanent ghost" for the fifteen months prior.[5] As a ghost, Durkin observed narcotics buys; as an undercover officer he actually could make the buys.

Durkin described the reasons he wanted to testify in a closed courtroom. As an undercover he had made four buys which resulted in arrests in the area of Hell's Kitchen Park, the same area in which petitioner was arrested. Two of those cases were pending.[6] Durkin testified that he would continue to return to the same area to make undercover buys.[7] He had been threatened by people from whom he had tried to buy, who said that they would kill him if they found out he was a cop.[8] Durkin testified that his physical safety would be endangered if his identity as a police officer were revealed in an open proceeding.[9] He explained that his identity could be revealed at the courthouse because there are a lot of defendants walking to the courtrooms.[10] Durkin also explained the precautions he had taken in coming to

court the day of the *Hinton* hearing to avoid such a revelation: riding in an undercover van, taking a back elevator, wearing plain clothes and not wearing a police shield.[11]

Durkin testified further about precautions he had taken to conceal his identity in other court proceedings. He had testified four times in the month before petitioner's *Hinton* hearing, and the courtroom had been closed on each occasion.[12] Durkin on these occasions took precautions such as waiting in a witness room for several hours to avoid being seen,[13] using the judge's elevator,[14] and asking a plainclothes officer to check a public hallway to see whether anyone was there.[15]

After Durkin had testified, the suppression court granted the application to close the courtroom during the suppression hearing. It found that the officer should not be "required to jeopardize his position" and referred to the officer's "concern[ ] for his safety."[16] It mentioned that "there are two present grand jury proceedings pending [at] which assumedly he'll be called upon to testify."[17] The court stated also that if a family member of the defendant wished to enter the courtroom, the court would entertain an application for him or

**2.** The team was not identified, other than as "Manhattan South TNT," during the hearing but the full name appears in other cases. *See, e.g., Glaude v. Artuz,* No. 98–2869, 1999 WL 568033 (2d Cir.) at *1. The Court understands this to be the same organization.

**3.** Petitioner's Appendix (hereafter A.__) at 5.

**4.** A.5.

**5.** A.4, 6.

**6.** A.7–8.

**7.** A.9.

**8.** A.9–10.

**9.** A.10.

**10.** A.11.

**11.** A.10–11.

**12.** A.22.

**13.** A.17–18.

**14.** A.22.

**15.** A.23.

**16.** A.31.

**17.** A.31. Petitioner suggests that this finding was faulty, that in fact the two cases referred to were post-indictment. That is far from clear. Durkin testified that he had been involved in "about four" arrests in the relevant area, Hell's Kitchen Park. A.8. Of those, he testified, two were pending, that is, there were grand jury indictments but the defendant had not plead. The two cases the court mentioned, then, may have been the two remaining unindicted arrests.

her to do so.[18]

After the suppression hearing, petitioner proceeded to trial, at which the prosecution again moved to close the courtroom during the testimony of the undercover officers. In considering closure during the trial testimony of Detective Durkin, the trial court reviewed the minutes of the *Hinton* hearing, although that hearing had been only five days earlier. The court asked for and received a representation that Durkin's situation had not changed.[19] It concluded that because "[Durkin's] usefulness would be impaired and he feared for his physical safety, together with ongoing investigations in the community" it would close the courtroom when Durkin testified at trial.[20]

The trial court conducted a second *Hinton* hearing to consider whether to close the courtroom during the testimony of Detective Kissane. During that hearing, Kissane testified on many of the same topics that Durkin had. He too was an undercover officer assigned to Manhattan TNT, in his case for two years.[21] He had made over 180 buys as an undercover officer, between 35 and 40 of them in the area of Hell's Kitchen Park alone.[22] Cases remained pending concerning 15–20 buys he had made in the vicinity of Hell's Kitchen Park.[23] Kissane explained that he was engaged in an ongoing undercover operation in the Hell's Kitchen Park area and that it was "very likely" he would be back in that area trying to make buys.[24]

Kissane testified that revelation of his identity as a police officer both would endanger his physical safety and compromise his usefulness as an undercover police officer.[25] He explained that his fears for his physical safety were based on actual threats made during his undercover buys: one person had pulled a knife on him; another had threatened to kill him if he was a cop.[26] He stated also that drug dealers and people addicted to drugs generally are violent people.[27]

Kissane described the efforts he had made to conceal his identity in coming to court on the day of petitioner's trial and on other occasions. On the day of petitioner's trial, he tried to take the judge's elevator; when that failed, he took the stairs, which were empty of other people.[28] Kissane had testified as an undercover officer on approximately ten other occasions, and the courtroom had been closed on each of those occasions.[29]

After the *Hinton* hearing as to Detective Kissane, the trial court closed the courtroom during his trial testimony as well.[30] The court explained that it based its decision on Kissane's "fear for his physical safety" and on the concern that "the usefulness of … him being used as an undercover agent would be impaired or destroyed" if he testified in an open proceeding.[31]

The jury convicted petitioner of third degree criminal possession of a controlled substance, and the conviction was affirmed.[32] The Court of Appeals denied

---

18. A.31–32.

19. A.46.

20. A.45–46.

21. A.36.

22. A.37.

23. A.38.

24. A.37.

25. A.38–39.

26. A.38.

27. A.39.

28. *Id.*

29. A.42.

30. A.44–45.

31. *Id.*

32. Pet.Mem. at 2; *People v. Soto*, 235 A.D.2d 349, 652 N.Y.S.2d 967 (1st Dep't 1997).

leave to appeal.[33]

## Discussion

### Public Trials

Public trials serve both defendants and the community. The Sixth and Fourteenth Amendments to the Constitution guarantee an open trial to every defendant, reflecting a belief that openness "enhances ... the basic fairness of the criminal trial."[34] "The public trial guarantee," as Justice Harlan described it, "embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings."[35] Open trials serve goals of the larger community too. "Openness ... enhances ... the appearance of fairness so essential to public confidence in the system."[36] It "vindicate[s] the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected."[37]

Notwithstanding its importance, the right to a public trial is not unqualified. "[T]he right to an open trial may give way in certain cases to other rights or interests, such as ... the government's interest in inhibiting disclosure of sensitive information."[38] In *Waller v. Georgia*,[39] the Supreme Court articulated a framework which balances the defendant's and community's interests in an open trial against the asserted government interest in closure. *Waller* laid out a four part test for evaluating closure requests: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced," (2) "the closure must be no broader than necessary to protect that interest," (3) "the trial court must consider reasonable alternatives to closing the proceeding," and (4) the court "must make findings adequate to support the closure."[40]

### Adequacy of the Factual Findings

In this case, petitioner asserts only that the trial court failed to satisfy the fourth prong of the *Waller* test, that is, that it "failed to make adequate findings to support its decision" to close the courtroom.[41] Case law in this circuit provides some guidance as to what findings are required. The Second Circuit has said that "[b]road and general findings are insufficient to

---

**33.** *People v. Soto*, 90 N.Y.2d 898, 662 N.Y.S.2d 441, 685 N.E.2d 222 (1997).

**34.** *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984).

**35.** *Estes v. Texas*, 381 U.S. 532, 588, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring). The Second Circuit has written, however, that "the assumption that a witness would speak more truthfully in public, because of shame or fear of public exposure of a lie, is one that may have had some basis in a different time and place when a courtroom audience comprised members of the community who knew the parties and who might have firsthand knowledge of the facts." *Brown v. Kuhlmann*, 142 F.3d 529, 535 (2d Cir.1998). Today, the Circuit commented, a "petitioner enjoy[s] a better chance of winning the lottery than of having a transient spectator in the courtroom who would have remembered witnessing [the events testified about]." *Id.*

**36.** *Press–Enterprise*, 464 U.S. at 508, 104 S.Ct. 819.

**37.** *Id.* at 509, 104 S.Ct. 819.

**38.** *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).

**39.** 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).

**40.** *Id.* at 48, 104 S.Ct. 2210 (1984).

**41.** Pet.Mem. at 9. Petitioner challenges the adequacy of the factual findings made when the courtroom was closed. It is unclear from his papers whether he challenges only the findings made during the closure of his trial or whether he challenges the findings made at closure of the suppression hearing as well. In the interest of completeness, the Court considers the closure of both the suppression hearing and the trial.

meet [*Waller*'s findings] requirement."[42] In *Mason v. Schriver*, 14 F.Supp.2d 321 (S.D.N.Y.1998)[43] another judge of this court wrote that conclusory statements "fall[ ] far short of the 'explicit' and 'specific' recorded findings necessary to support closure" and held that a trial court's statement that "I find that the People have met their burden of showing that closure is justified" was insufficient to satisfy the findings requirement.[44]

The Second Circuit has explained also that "the strength of the judge's findings [under the fourth prong of *Waller*] must be evaluated by reference to the ... scope of the closure that they support."[45] Where the closure is limited, the scrutiny given the findings is correspondingly less.[46] Employing that standard, the Circuit found, in a case in which it characterized "the reasons [a judge] gave for [closing a courtroom] ... [as] neither entirely accurate not particularly compelling," that nonetheless "the trial court's findings were adequate" to support a limited closure.[47]

Most instructive here are the Supreme Court's characterizations of the findings required under a *Waller* analysis. The Court has explained that what is required are findings "specific enough that a reviewing court can determine whether the closure order was properly entered."[48] At bottom, the requirement serves to insure that the judge closing a courtroom considers the factors which the case law requires and concludes that each factor has been satisfied.

The ultimate question here, then, is whether the findings made below adequately demonstrate the courts' consideration of the factors *Waller* dictates. And while petitioner does not challenge the courts' conclusions that the first three prongs of the *Waller* test were satisfied, this Court must assure itself that the courts adequately considered the other three prongs of the *Waller* analysis in order to conclude that the findings were adequate.

*Detective Durkin*

Under *Waller*, the government first must present an overriding state interest in closure. Detective Durkin testified in detail and at length—for almost 25 pages of transcript—about the danger to his safety and effectiveness that could flow from exposure of his identity and about the steps he took to prevent such exposure. In considering whether to close the courtroom during Durkin's testimony, both the suppression and the trial judges made specific reference to these concerns about safety and effectiveness. These references are sufficient to indicate that the judges credited the officer's testimony on these topics. The findings of both judges therefore indicate that they considered the first *Waller* factor and found it satisfied.[49]

■ The second and third prongs of the *Waller* analysis—that the closure be no broader than necessary to protect the state interest and the need for the court to consider alternatives to closing the proceeding—are connected conceptually. The

**42.** *English v. Artuz*, 164 F.3d 105, 109 (2d Cir.1998).

**43.** 14 F.Supp.2d 321 (S.D.N.Y.1998).

**44.** *Id.* at 325.

**45.** *Brown v. Kuhlmann*, 142 F.3d at 538; *see also Glaude v. Artuz*, No. 98–2869, 1999 WL 568033 (2d Cir.1999) at \*3.

**46.** *Brown v. Kuhlmann*, 142 F.3d at 538.

**47.** *Id.; Glaude v. Artuz*, 1999 WL 568033 at \*3.

**48.** *Press–Enterprise*, 464 U.S. at 510, 104 S.Ct. 819.

**49.** Petitioner suggests that the trial judge could not make such findings solely on the basis of a transcript. He has cited no case, however, for this proposition. The testimony was sworn and was only five days old. Nor has petitioner explained why the trial judge might not consider the judgment of the suppression judge, who did see Durkin testify, that the officer was a credible witness.

Second Circuit, for example, has ruled that "closure of the courtroom during the testimony of a single witness is itself a narrower alternative than closure for the duration of the proceeding."[50] As for the third factor, the Circuit has said that when a courtroom is closed only for the testimony of individual witnesses, rather than for the proceeding as a whole, the judge necessarily has chosen a narrower alternative and there is "no further obligation to 'consider alternatives to the alternative,' in the absence of a request from the defendant."[51] In other words, when a courtroom is closed only for the testimony of individual witnesses, rather than for an entire proceeding, the law presumes consideration of alternatives and does not require courts to recite that consideration.

In this case, the closures of parts of the suppression hearing and the trial were narrow. Each was closed only for the testimony of the undercover officers. In addition, a transcript was made, a practice which increased the opportunity for scrutiny of the proceedings.[52] Given the Second Circuit's holding that consideration of other alternatives is presumed in such circumstances, no findings were required on the second and third prongs of the *Waller* test. Moreover, the suppression court's findings show particular attention to the scope of the closure. That court volunteered, apparently *sua sponte,* that it would entertain an application for defendant's family members to be present, although no such application appears to have been made.

*Detective Kissane*

Much the same analysis applies to closure of the trial courtroom during Detective Kissane's testimony. The court's findings specifically mentioned the detective's physical safety and the impairment or destruction of his usefulness as an undercover officer, thus indicating that the judge considered whether an overriding state interest existed, credited Kissane's testimony on the question, and found the first prong of the *Waller* test had been satisfied. Given the limited extent of the closure, the trial court's findings were adequate to satisfy the second and third prongs of *Waller* as well.

*The Showing Supporting the Findings*

Closure of a courtroom during the testimony of police officers is a serious step. This is particularly true in a "buy and bust" case such as petitioner's, where the closed testimony typically is "the testimony of an undercover police officer who was a party to a ... transaction with the defendant. In such a case, the prosecution invariably centers around this witness."[53] But petitioner's effort to bring himself within cases such as *Guzman v. Scully,*[54] in which the Second Circuit found the trial court's conclusory findings inadequate to close the courtroom, is unsuccessful. In that case, the court heard no witnesses or argument, and held no separate hearing, on the closure issue. It simply heard statements by counsel, failed to inquire into some of the confusing facts presented, and relied on unsubstantiated facts stated by the prosecutor. This is not such a case.

Nor is this a case in which the People shrank from their burden of producing evidence on the need for closure. In *Brown v. Andrews,*[55] the Second Circuit recently reiterated that the burden of making a particularized showing to justify closure, while "not meant to be a heavy one," clearly rests with the state, which normally has possession of all the facts

---

**50.** *Brown v. Kuhlmann,* 142 F.3d at 538.

**51.** *Id.*

**52.** *Id.* at 535–36.

The transcript of the suppression hearing appears to have been sealed pending a contrary order. A.31. There is no basis, however, for believing that the transcript would not have been made available to the public had a request been made.

**53.** *Id.* at 534.

**54.** 80 F.3d 772 (2d Cir.1996).

**55.** 180 F.3d 403 (2d Cir.1999).

relevant to this inquiry.[56] The *Brown* case in fact stands as an instructive contrast to the showing in this case. The Second Circuit there pointed out, among other things, that the undercover officer presented no evidence of specific threats made against him, no information about why testifying in particular posed a danger, and no information about what steps he took to conceal his identity when coming to the courthouse.[57] None of those deficiencies is present in this case. Here, the People made a detailed showing—the adequacy of which petitioner does not challenge—and the courts' findings demonstrate that they considered the relevant law and credited the People's witnesses.

### Conclusion

Although the findings made by the state courts might have been more detailed, they were adequate to demonstrate that both courts considered the relevant legal factors and found them satisfied. The findings were thus sufficient to permit review and to support closure of the courtroom in petitioner's case. The petition therefore is denied.

SO ORDERED.

---

**56.** *Brown v. Andrews,* 180 F.3d at 408.  **57.** *Id.* at 408–09.