Nelson CADILLA, Petitioner,

v.

Sally JOHNSON, Respondent.

No. 98 CIV. 8658 SHS THK.

United States District Court,
S.D. New York.

Sept. 27, 2000.

Irving Henry, a.k.a. Nelson Cadilla, a.k.a. Nester Cadilla, Brooklyn, NY, pro se.

Stacy R. Sabatini, Assistant Attorney General, Office of the Attorney General of the State of New York City, for respondent.

### ORDER

STEIN, District Judge.

In a "Report and Recommendation" dated September 11, 2000, U.S. Magistrate Judge Theodore H. Katz recommended that the petition for a writ of *habeas corpus* be denied and that the action be dismissed with prejudice. As of today, no objections have been received by the Court.

Upon *de novo* review of Magistrate Judge Katz's "Report and Recommendation" dated September 11, 2000,

IT IS HEREBY ORDERED that:

1. Petitioner's application for a writ of *habeas corpus* is denied and the petition dismissed on the grounds set forth in the Report and Recommendation;

2. As petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253, as amended by the AEDPA; *see also Rodriquez v. Scully,* 905 F.2d 24 (2d Cir.1990) (*per curiam* ) (discussing issuance of a certificate of probable cause under standard prior to amendment of 28 U.S.C. § 2253); *Alexander v. Harris,* 595 F.2d 87, 90 (2d Cir.1979).

3. Pursuant to 28 U.S.C. § 1915(a) the Court certifies that any appeal from this Order would not be taken in good faith.

SO ORDERED:

### REPORT AND RECOMMENDATION

KATZ, United States Magistrate Judge.

This habeas corpus proceeding was referred to me for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(d) of the Southern District of New York Local Civil Rules. Petitioner, a former New York State prisoner currently on parole, seeks habeas relief under 28 U.S.C. § 2254, claiming that his conviction resulted from a violation of his constitutional rights, insofar as: (1) the integrity of the grand jury that indicted him was impaired by the introduction of inadmissible hearsay; (2) the indictment should have been dismissed because of denial of a speedy trial; and (3) the trial court improperly closed the courtroom during the testimony of the undercover police officer. *See* Petition. Respondent has moved to dismiss the action. For the reasons that follow, I respectfully recommend that the action be dismissed with prejudice.

### BACKGROUND

Petitioner was tried in New York County (Figueroa, J.) on February 6 and 7,

1995, on charges of Criminal Sale of a Controlled Substance in the third degree and Criminal Possession of a Controlled Substance in the third degree.

Undercover Officer Guy Laieta testified at trial that shortly before 7:50 a.m. on March 2, 1994, he drove his unmarked van to the vicinity of Essex and Houston Streets, which was approximately four blocks from that day's targeted drug buy area. (Tr. at 134.)[1] Laieta testified that the only money he carried with him was pre-recorded buy money in the form of six five-dollar bills. (Tr. at 133.) Laieta testified that as he left his van, he walked toward the corner of Stanton Street and Clinton Street, where he noticed petitioner standing alone on the corner. (Tr. at 133–134.) He described petitioner as a very dark-skinned Hispanic man, with a beard and mustache, approximately 5'6" or 5'7" tall, and wearing a black leather coat, jeans, and a sweatshirt with a grey hood on his head. (Tr. at 134, 136, 138–139.)

Laieta testified that he approached petitioner and asked him if he had any "dimes." He explained that, based upon his experiences as an undercover officer, "dimes" were $10 packages of heroin. (Tr. at 135–136.) He also testified that he had always bought "dimes" at that location. (Tr. at 135, 137.) In response to his request, petitioner asked "How many?", and Laieta replied "Give me three." (Tr. at 134–135, 139.) Laieta testified that petitioner then handed Laieta three glassine envelopes containing what he believed to be heroin, and Laieta handed petitioner the $30 of pre-recorded buy money. (Tr. at 135, 141.) Laieta testified that, in his experience, heroin is usually sold in glassine envelopes, although the glassine envelopes sold to him by petitioner were "beat up as opposed to neat." (Tr. at 139–140.)

Immediately after this transaction took place, Laieta walked away and used his hidden transmitter to notify the officers in the van that he had made a positive buy. (Tr. at 135–137.) Laieta also testified that, in this transmission, he described petitioner to the other officers. (Tr. at 136.)

Laieta testified that he then drove to the location where petitioner had been apprehended by the other officers, in order to make a confirmatory identification. (Tr. at 142–144, 153, 160.) Laieta testified that he informed the field team that they had "apprehended the correct person." (Tr. at 144–145.) Laieta identified petitioner at trial as the person from whom he had purchased the glassine envelopes. (Tr. at 136.)

Police Officer David Warner, a member of the Manhattan South Strategic Narcotics and Guns Unit, testified that he was the arresting officer accompanying Laieta on the buy operation. (Tr. at 164.) Warner testified that, upon receiving Laieta's radio transmission, he immediately drove to the intersection of Clinton Street and Stanton Street, looking for the individual Laieta had described. (Tr. at 167–168, 171.) Warner observed petitioner standing in that area and Warner arrested him. (Tr. at 167–169, 171, 183–184, 186–189.) Warner testified that petitioner appeared to be counting money, although petitioner dropped the money he was counting when Warner approached him. (Tr. at 170.) Warner testified that he recovered a total of $34.00 from the ground—six five-dollar bills and four one-dollar bills. (Tr. at 171.) Warner further testified that the serial numbers of the six five-dollar bills recovered from petitioner matched the pre-recorded buy money. (Tr. at 171–172, 174–179.) Additionally, Warner testified that he recovered five glassine envelopes from petitioner's left pants pocket. (Tr. at 172). Warner identified petitioner at trial. (Tr. at 169.)

---

1. Following a hearing, the trial court determined that the courtroom would be closed during Laieta's testimony, although petitioner's immediate family was permitted to remain in the courtroom. (Tr. at 121–123.)

Mariem Megalla, a chemist in the New York City Police Department, testified that she tested the three glassine envelopes that Officer Laieta had purchased from petitioner, and that the three glassine envelopes contained heroin. (Tr. at 196–198.) Megalla also testified that the weight of the heroin she tested was "less than 1.0 gram." (Tr. at 198.) On cross-examination, Megalla testified that the amount present in each envelope could not accurately be measured "because it's a little amount." (Tr. at 209.) She also testified on cross-examination that she used her memory to compare the colors generated by the tests to those indicative of heroin, instead of relying on standard color cards. (Tr. at 213.)

Josephine Bishara, a chemist in the New York City Police Department, testified that she tested the five glassine envelopes that Officer Warner had recovered from petitioner's clothing. Bishara testified that each envelope tested positive for heroin, and that she too assessed the colors generated by the tests based on her memory, instead of using any standard chart. (Tr. at 230–233.) Bishara also testified that the weight of heroin in each bag was "less than a gram." (Tr. at 229.)

Petitioner then testified in his own defense. Petitioner testified that he was a drug addict who had abused heroin for ten to fifteen years. (Tr. at 237, 246, 255–256.) Petitioner testified that on the morning of March 2, 1994, he was approached by a man who asked him if he "had any dimes." (Tr. at 237.) Petitioner testified that he "knew something was wrong, because dimes are not used for heroin, you don't use the term 'dimes.'" (Tr. at 237.) At first, petitioner ignored the man and walked away. (Tr. at 237, 243, 245, 249.) The man followed petitioner, and said, "I'm late for work, would you please help me out." (Tr. at 237.) Petitioner then "gave him three glassine bags," and the man gave petitioner thirty dollars and walked away. (Tr. at 237–238.) Petitioner testified that the bags he gave the man

were "in very bad conditions," and that "you could tell it was opened, it was used before." (Tr. at 241.)

Petitioner testified that the bags he sold the man had contained baking soda, rather than heroin. (Tr. at 238.) Petitioner testified that on the day before this sale, he had purchased four glassine envelopes of heroin, and the bags that he sold the man "came from the ones I used the night before." (Tr. at 238, 249–250.) After using all of the heroin in the envelopes, petitioner filled three used glassine envelopes with baking soda, about the amount of an aspirin tablet, which he hoped to "pass off" as heroin or some other drug. (Tr. at 238–239, 241, 246–254.) Petitioner also testified that he had picked up five additional glassine envelopes which he hoped to use for the same purpose. (Tr. at 250.) Petitioner testified that the understanding between the man and petitioner was that petitioner would give him heroin for money, but that, to petitioner's knowledge, there was no heroin in the bags. (Tr. at 239–240.) Petitioner further testified that he was arrested approximately five minutes after the sale. (Tr. at 242–245.)

Dr. Max Solomon, a retired chemical analyst with a Ph.D. in Chemistry and a consultant in the field of chemical forensics, testified on petitioner's behalf. Dr. Solomon testified that the tests used by the police department chemists produced a wide spectrum of colors, and that to rely on one's memory, instead of a standardized color chart, could not possibly result in an accurate result. (Tr. at 265.) Additionally, Dr. Solomon testified that the tests used by the police department chemists were neither reliable nor acceptable for identifying controlled substances, and that one of the tests performed has "nothing to do with heroin." (Tr. at 261–262, 266, 271–272.) Dr. Solomon admitted that he had not personally tested the contents of the eight glassine envelopes in evidence in this case. (Tr. at 273).

The prosecution then re-called Dr. Bishara to testify as a rebuttal witness. She testified that, based on her ten years of experience of performing drug analyses at the New York City Police Department laboratory, she believed that the tests used on the contents of the eight glassine envelopes in evidence in this case yielded "reliable" results for determining the presence or absence of controlled substances. (Tr. at 280–281.) She also testified that she relied on her memory in performing the tests because she knew the identifying characteristics for the tests "by heart." (Tr. at 281.)

■ On February 7, 1995, the jury returned a verdict convicting petitioner of Criminal Possession of a Controlled Substance in the third degree, in violation of New York Penal Law § 220.16(1), and of Criminal Sale of a Controlled Substance in the third degree, in violation of New York Penal Law § 220.39(1). On March 1, 1995, the court sentenced petitioner, as a second felony offender, to concurrent indeterminate prison terms of from four and one-half to nine years. (Sentencing Transcript at 8.)[2]

Petitioner appealed his conviction to the Appellate Division, First Department, arguing that: (1) the integrity of the grand jury which indicted him was compromised by the introduction of inadmissible hearsay; (2) the prosecution failed to bring the case to trial within the time period required by New York Criminal Procedure Law ("C.P.L.") § 30.30; and (3) the trial court improperly closed the courtroom during the undercover officer's testimony. See Brief for Defendant–Appellant, at 1–2.

On December 2, 1997, the Appellate Division unanimously affirmed the judgment of conviction, holding: (1) the trial court properly denied petitioner's speedy trial

motion; (2) the trial court properly closed the courtroom during the undercover officer's trial testimony; and (3) petitioner's claim that hearsay testimony tainted the grand jury proceeding was without merit. See People v. Cadilla, 245 A.D.2d 9, 666 N.Y.S.2d 111 (1st Dep't 1997). On February 19, 1998, the New York Court of Appeals denied petitioner's application for leave to appeal. See People v. Cadilla, 91 N.Y.2d 924 (1998).

Petitioner then filed the instant petition for a writ of habeas corpus.

## DISCUSSION

### I. The Grand Jury Proceeding

Petitioner argues that the indictment should have been dismissed because the evidence before the grand jury was legally insufficient. Specifically, he argues that the lab reports presented to the grand jury constituted inadmissible hearsay which impaired the integrity of the grand jury, and mandated the dismissal of the indictment. See Petition.

■ A jury conviction transforms any defect connected with the grand jury's charging decision into harmless error, because the trial conviction establishes not only probable cause to indict, but also proof of guilt beyond a reasonable doubt. See United States v. Mechanik, 475 U.S. 66, 70, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986); Lopez v. Riley, 865 F.2d 30, 32 (2d Cir.1989); Norman v. People of the State of New York, No. 97 Civ. 7051(MBM), 1999 WL 983869, at *6 (S.D.N.Y. Oct.29, 1999); Bramble v. Smith, No. 96 Civ. 5905(JAK), 1998 WL 395265, at *18 (S.D.N.Y. July 15, 1998); Boyd v. Hawk, 965 F.Supp. 443, 451 (S.D.N.Y.1997). Petitioner's claim that hearsay in the grand jury proceeding un-

---

**2.** After serving his sentence at the Orleans Correctional Facility, petitioner was released on parole. The fact that petitioner has been released from prison does not render his petition for habeas corpus moot. A habeas petition does not become moot by the discharge of a petitioner from physical custody. See

Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978, 983, 140 L.Ed.2d 43 (1998); Wheel v. Robinson, 34 F.3d 60, 63 (2d Cir.1994) (§ 2254 requires only that the petitioner be "in custody" at the time the petition is filed); Thompson v. McElroy, No. 98 Civ. 1530(SAS), 1998 WL 157019, at *1 (S.D.N.Y. Apr.3, 1998).

dermined the legal sufficiency of the indictment is therefore not a constitutional claim that is cognizable under federal habeas review, because petitioner was convicted by a jury after a trial. *Cf. United States v. Diaz,* 922 F.2d 998 (2d Cir.1990) (any error in presenting mostly hearsay evidence to the grand jury was harmless where the jury convicted defendant at trial after hearing defendants' own testimony); *Lopez v. Riley,* 865 F.2d at 32 (deficiencies in state grand jury not subject to federal court review through a habeas corpus petition); *Barber v. Garvin,* No. 99 Civ. 88(JSM), 2000 WL 423639, at *1 (S.D.N.Y. Apr.19, 2000) (petitioner's claim that there was insufficient evidence before the state grand jury to indict is not cognizable on federal habeas corpus review); *Spulka v. Walker,* No. 97 Civ. 1879(DLC), 1998 WL 274287, at *2 (S.D.N.Y. May 27, 1998) (petitioner's claim that laboratory report lacking proper certification was erroneously submitted to the grand jury was without merit, because guilty verdict cured any defect in the grand jury proceeding).

Moreover, petitioner's claim that improper hearsay testimony was admitted during the grand jury proceeding is meritless. Under New York law, a motion to dismiss the indictment may be granted if the grand jury proceeding was defective to such a degree that the integrity of the proceeding was impaired, and prejudice to the defendant may result. *See* New York C.P.L. § 210.20(c) and § 210.35(5) (McKinney 1993).

■ Petitioner contends that the certified reports completed by the two lab technicians who tested the contents of the glassine envelopes at issue constituted inadmissible hearsay. Under New York law:

A report or a copy of a report made by a public servant ... who is a ... chemist ... concerning the results of an examination, comparison or subject of a grand jury proceeding may, when certified by such person as a report made by him or as a true copy thereof, be received in

such grand jury proceeding as evidence of the facts stated therein.

C.P.L. § 190.30(2) (McKinney 1993); *see also People v. Swamp,* 84 N.Y.2d 725, 730, 622 N.Y.S.2d 472, 646 N.E.2d 774 (1995) (holding that C.P.L. § 190.30(2) authorizes the prosecution to submit to the grand jury a certified laboratory report in place of the live testimony of the technician who performed tests on a controlled substance). The reports submitted to the grand jury each contained a certification, signed by the examining chemist, that stated, "I hereby certify that the foregoing report is a true and full copy of the original report made by me." *See* Laboratory Reports, attached as Exhibits 1 and 2 to Motion to Dismiss the Indictment. Thus, the chemists' reports were properly admitted in evidence in the grand jury proceeding. *Cf. People v. Washington,* 228 A.D.2d 23, 652 N.Y.S.2d 750, 751 (2d Dep't) (chemist's report containing "Chemist['s] Name" at bottom, and certification, by which chemist certified that "the foregoing report is a true and full copy of the original report made by me" was sufficient to support indictment for drug offense), *lv. to appeal denied,* 90 N.Y.2d 899, 662 N.Y.S.2d 442, 685 N.E.2d 223 (1997).

Because petitioner's claim regarding the grand jury proceeding is not cognizable on habeas review, and is meritless under state law, I respectfully recommend that this claim be dismissed.

## II. Right to a Speedy Trial

Petitioner argues that the prosecution was not ready for trial within the time allotted by C.P.L. § 30.30, and accordingly he was denied his right to a speedy trial. Specifically, petitioner argues that 140 days, from August 23, 1994 to February 3, 1995, should have been chargeable to the prosecution, bringing the total number of days chargeable to the prosecution over the six-month limit imposed by C.P.L.

§ 30.30. *See* Petition.[3] Petitioner fails to raise a constitutional claim that is cognizable on federal habeas corpus review.

The following are the facts underlying petitioner's claim. By motion to release the defendant on his own recognizance under C.P.L. § 30.30, dated August 23, 1994, petitioner's defense counsel argued that, at that time, 137 days had passed since petitioner was indicted, mandating his release from state custody.[4] *See* Defendant's Affirmation, attached to Notice of Motion under C.P.L. § 30.30(2)(a). The prosecution conceded that petitioner's release was warranted, although the prosecution asserted that only 96 days of includable time had elapsed. *See* Prosecution's Affirmation in Response to Defendant's Motion for Release Pursuant to C.P.L. § 30.30. Accordingly, the trial court granted petitioner's motion and released him on his own recognizance, with an order that he return to court on September 27, 1994.

As petitioner left the courthouse, he was detained by the Division of Parole for a prior criminal violation he had committed under the name of Irving Henry. *See* Defendant's Affirmation, attached to Notice of Motion, dated December 6, 1994; Rap Sheet, attached to Defendant's Supplementary Affirmation to Motion to Dismiss on Speedy Trial Grounds, dated January, 1995. Petitioner was then incarcerated in the Downstate Correctional Facility. When petitioner then failed to appear in court on the charges in issue in this action, on September 27, 1994, the trial court issued a bench warrant for petitioner's arrest. *See* Defendant's Affirmation, attached to Notice of Motion, dated December 6, 1994. Upon learning of petitioner's location, on or about November 4, 1994, the prosecution issued an order to have him produced in court on November 29, 1994, and on November 15, 1994 the prosecution filed a certificate of readiness to proceed. *See id.* On November 29, 1994, petitioner appeared in court, and his bench warrant was vacated. *See id.* Although the prosecution indicated that it was ready to proceed, due to the failure of defense counsel to appear, the case was adjourned to December 6, 1994. *See* Motion to Dismiss for Jurisdictionally Defective Grounds. On December 6, 1994, defense counsel appeared in court, and filed another C.P.L. § 30.30 motion, arguing that the indictment should be dismissed because 248 days had passed since petitioner had been arrested, which was a period in excess of the statutory maximum. *See* Affirmation in Response to Defendant's Motion to Dismiss Pursuant to C.P.L. § 30.30, dated January 11, 1995.[5]

On January 20, 1995, the trial court orally denied petitioner's motion, finding that the total time chargeable to the prosecution was less than the statutory maximum. Defense counsel filed a motion for reconsideration of the speedy trial decision, which was orally denied on February 3, 1995. *See* Defendant's Motion for Reconsideration, dated February 3, 1995.[6]

---

3. The New York State legislature amended portions of C.P.L. § 30.30 in 1996. The amended portions of C.P.L. § 30.30, however, only apply to criminal actions commenced on or after the amendments were enacted into law. *See* C.P.L. § 30.30 (McKinney Supp. 2000). Therefore, the pre-amendment statute applies in this case.

4. C.P.L. § 30.30(2)(a) provides that a defendant must be released on bail or on his own recognizance if the prosecution is not ready for trial within "ninety days from the commencement of his commitment." C.P.L. § 30.30(2)(a) (McKinney 1992).

5. C.P.L. § 30.30(1)(a) provides that a motion to dismiss or reduce the indictment must be granted where the prosecution is not ready for trial within "six months of the commencement of a criminal action wherein a defendant is accused of one or more offenses, at least one of which is a felony." C.P.L. § 30.30(1)(a) (McKinney 1992).

6. The Appellate Division, which considered petitioner's claim solely in terms of New York state law, affirmed the trial court's decision, holding that "since the People did not have actual knowledge that defendant was confined on a violation of parole under another

■ The claim petitioner raised in state court and now raises in this proceeding rests solely on state procedural grounds. C.P.L. § 30.30 requires only that the prosecution be ready for trial within a prescribed time frame, and not that the defendant actually be afforded a speedy trial. *See People v. Anderson*, 66 N.Y.2d 529, 498 N.Y.S.2d 119, 488 N.E.2d 1231 (1985) (C.P.L. § 30.30, setting forth time limitations in which People must be ready for trial, addresses only problem of prosecutorial readiness, and is not a speedy trial statute in the constitutional sense). Because C.P.L. § 30.30 is merely a state law provision requiring the prosecution to be ready for trial, a § 30.30 claim does not raise a federal constitutional claim. *Cf. Gibriano v. Attorney General of the State of New York*, 965 F.Supp. 489, 491–492 (S.D.N.Y.1997) (denying habeas relief and noting that "Section 30.30 [of the New York Criminal Procedure Law] is a statutory time in which the People of New York must be ready for trial; Section 30.30 is not, as such, a statutory embodiment of the constitutional

guarantee to a speedy trial."); *Rodriguez v. Miller*, No. 96 Civ. 4723(HB), 1997 WL 599388, at *2 (S.D.N.Y. Sept.29, 1997) ("[A] C.P.L. § 30.30 claim has been held not to raise the federal constitutional speedy trial claim for purposes of a federal habeas petition"); *Jackson v. McClellan*, No. 92 Civ. 7217(JFK), 1994 WL 75042, at *2 (S.D.N.Y. Mar.4, 1994) (petitioner failed to fairly present constitutional speedy trial issue to state court where petitioner argued "entirely in terms of New York Statutory law [C.P.L. § 30.30]"). Indeed, petitioner does not invoke any federal constitutional provision in pursuing this claim, and in the state courts he argued the claim solely on state procedural grounds.[7]

I therefore respectfully recommend that petitioner's speedy trial claim be dismissed.

## III. Right to A Public Trial

Petitioner argues that he was "deprived of a fair and public trial when the courtroom was sealed, over counsel's objec-

---

name and the record points to a pattern of behavior on his part to avoid apprehension or prosecution, the period of delay between the issuance of the bench warrant and the production of defendant was not chargeable to the People, regardless of whether diligent efforts were made to locate him," and that "the total amount of includable time did not exceed the statutory limit." *Cadilla*, 666 N.Y.S.2d at 112.

7. Even if petitioner's claim were construed as arguing a deprivation of his constitutional right to a speedy trial, rather than a state law error under C.P.L. § 30.30, that claim would be unexhausted and procedurally barred. Petitioner failed to fairly present a claim of a denial of the constitutional right to a speedy trial to the state courts. *Cf. Gibriano*, 965 F.Supp. at 491–492 (when petitioner twice raised his statutory speedy trial claim in the state court under Section 30.30, "he did not effectively present to those courts the federal constitutional speedy trial claim that he raises now in this court"). A habeas court cannot review a claim unless the claim is exhausted. *See* 28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275–276, 92 S.Ct. 509, 512–513, 30 L.Ed.2d 438 (1971); *Jones v.

*Vacco*, 126 F.3d 408, 413 (2d Cir.1997). A petitioner must return to state court if he has not exhausted his state remedies. *See Engle v. Isaac*, 456 U.S. 107, 125–126 n. 28, 102 S.Ct. 1558, 1570, 71 L.Ed.2d 783 (1982). If a petitioner has no available state forum in which to pursue a state remedy because of a procedural bar, however, his claim may be deemed exhausted, yet forfeited. *See Teague v. Lane*, 489 U.S. 288, 297–299, 109 S.Ct. 1060, 1068–1069, 103 L.Ed.2d 334 (1989); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir.1991). New York law allows the filing of only one application for leave to appeal to the Court of Appeals. *See Strogov v. Attorney General*, 191 F.3d 188, 193 (2d Cir.1999); *Redd v. Quinones*, No. 98 Civ. 2604(LBS), 1998 WL 702334, at *3 (S.D.N.Y. Oct. 7, 1998); *Atkins v. Miller*, 18 F.Supp.2d 314, 318 (S.D.N.Y. 1998). Here, petitioner has already sought leave to appeal to the Court of Appeals and leave was denied; therefore, petitioner is barred from seeking further direct review from the Court of Appeals. State procedural bar is an independent and adequate state ground precluding federal habeas review. *See Harris v. Reed*, 489 U.S. 255, 261–262, 109 S.Ct. 1038, 1042–1043, 103 L.Ed.2d 308 (1989).

tions." Specifically, petitioner argues that the courtroom was improperly closed because the sole basis for the closure was Undercover Officer Laieta's fear that his usefulness as an undercover officer might be compromised in the future. *See* Petition.

 The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial," U.S. Const. amend VI, and is applicable to state prosecutions by virtue of the Fourteenth Amendment. *See Duncan v. Louisiana,* 391 U.S. 145, 148, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968). Although public trials are strongly favored, the right to a public trial is not absolute, and "may give way in certain cases to other rights and interests." *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 2214–2215, 81 L.Ed.2d 31 (1984) (citing *Press–Enterprise Co. v. Superior Court of California, Riverside County,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984)). In *Waller,* the Supreme Court held that a suppression hearing may not be closed to the public unless the following conditions are met:

(1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; (2) the closure must be no broader than necessary to protect that interest; (3) the trial court must consider reasonable alternatives to closing the proceeding; and (4) [the trial court] must make findings adequate to support the closure.

*Waller,* 467 U.S. at 48, 104 S.Ct. at 2216, 81 L.Ed.2d 31; *see also Nieblas v. Smith,* 204 F.3d 29, 33 (2d Cir.1999); *Bobb v. Senkowski,* 196 F.3d 350, 351 (2d Cir. 1999); *Brown v. Andrews,* 180 F.3d 403, 406 (2d Cir.1999); *Brown v. Kuhlmann,* 142 F.3d 529, 537 (2d Cir.1998).

In *Ayala v. Speckard,* 131 F.3d 62, 69–72 (2d Cir.1997)(*en banc* ), *cert. denied,* 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 747 (1998)("*Ayala III* "), the Second Circuit applied *Waller* in three consolidated cases—each of which involved the closure of the courtroom to all spectators during the testimony of the undercover officer who actually engaged in the "buy and bust" drug transaction with each of the respective defendants. In each case, the undercover officer testified that he was engaged in ongoing undercover work, expected to return to the area where the defendant had sold him drugs, and felt that his life would be endangered if his identity as an undercover officer was exposed to the public. The Court of Appeals held that in order to determine whether there was sufficient justification to override the petitioner's right to a public trial during the testimony of an undercover officer, the trial court should

require persuasive evidence of serious risk to an important interest in ordering any closure, and ... realize that the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest.

*Ayala III,* 131 F.3d at 70. The Court of Appeals also held that "once a trial judge has determined that limited closure is warranted as an alternative to complete closure, the judge [need not consider] sua sponte further alternatives to the alternative deemed appropriate." *Ayala III,* 131 F.3d at 71.

In *Ayala III,* the Second Circuit recognized that the interest in maintaining the effectiveness of an undercover officer was an extremely substantial interest, and concluded that the trial court's finding in each case—that this interest would be seriously prejudiced by requiring the undercover officer to testify in an open courtroom—was amply justified, in view of the limited closure of the courtroom. Although the courtroom was closed during the testimony of an important witness, the court noted that closure was limited to only one witness. *See Ayala III,* 131 F.3d at 72; *see also Nieblas,* 204 F.3d at 33 (where evidence established that undercover officer would return to the site where the defendant had engaged in drug trafficking, clo-

sure of courtroom was appropriate); *Pastrana v. Senkowski*, No. CV–97–5158, 1999 WL 1129050, at \*4 (E.D.N.Y. Oct.1, 1999) (public interest in officer's ability to continue undercover work was sufficiently compelling to support courtroom closure).[8]

In the present case, immediately after the jury was empaneled and counsel delivered opening statements, the trial court conducted evidentiary hearing to determine whether the courtroom would be closed for the testimony of Undercover Officer Guy Laieta, a member of the Manhattan South Strategic Narcotics and Guns Unit. (Tr. at 113–121.) During the hearing, Laieta testified that he was currently working undercover in investigating drug purchasing activity in the area from "[f]ifty-[n]inth Street, river to river, all the way to [the] bottom of Manhattan." (Tr. at 114.) Laieta testified that in the vicinity of Clinton Street and Stanton Street, where petitioner had been arrested, he had made approximately fifty drug buys; that he still operated actively in that area; and that he had approximately twenty-five or more outstanding operations in that area alone. (Tr. at 114–115, 118.) Laieta testified that he expected to return to Clinton Street and Stanton Street, which was located less than a half mile from the courthouse, during the week of the trial, in order to continue his undercover operations. (Tr. at 115–116, 118–119.) Laieta further testified that he needed to conceal his identity from the public "[b]ecause my safety would be jeopardized as well as my effectiveness as an undercover." (Tr. at 115.) He testified that he did not wear his shield outside the courtroom "[b]ecause it would jeopardize my identity and could risk my safety." (Tr. at 116.) The prosecutor argued that the courtroom should be closed in order to protect both Laieta's safety and his effectiveness as an undercover officer.

The trial court then made findings that Officer Laieta "has a legitimate fear for his safety;" that the Stanton Street and Clinton Street location where Laieta worked and petitioner was arrested was "a fairly small area;" and that Laieta had made numerous arrests in that area during the prior three months. (Tr. at 121.) The trial court further found that Laieta had "a legitimate fear for his safety and that he will return back to that area this week." (Tr. at 121.) The trial court found that since Laieta expected to return to the area where petitioner was arrested, during the week of the trial, and since he had over twenty-five outstanding cases in that area, "should someone actually recognize him here in court, it would definitely pose a risk to his life and limb." (Tr. at 122.) Accordingly, the trial judge sealed the courtroom during Officer Laieta's testimony on the ground that Laieta's safety would be at risk if he testified in an open courtroom. (Tr. at 122.) After a side-bar with counsel, the trial court modified its decision, informing defense counsel that "if there are any members of [petitioner's] immediate family who wish to remain present, I would modify my decision on the [courtroom closure], to that extent." (Tr. at 123.)

All of the *Waller* requirements were satisfied in this case.

## A. Overriding interest that is likely to be prejudiced by an open courtroom

 The state's interest in maintaining an undercover officer's safety, *Brown v. Kuhlmann*, 142 F.3d at 538, and in maintaining the effectiveness of an undercover officer by not having his/her identity disclosed, *Ayala III*, 131 F.3d at 72, are considered overriding or "extremely substantial interest[s]." *Ayala III*, 131 F.3d at 72; *see also Bowden v. Keane*, 85 F.Supp.2d 246, 249–50 (S.D.N.Y. 2000). In order to satisfy the *Waller* standard, the state must come forward with persuasive evidence of serious risk to at least one of these interests. *See Ayala III*, 131 F.3d

---

8. The *Ayala* court found it unnecessary to consider the respondent's argument that the

closure was also justified by the risk to the officer's safety. *See Ayala III*, 131 F.3d at 72.

at 70. With respect to the interest in effectiveness, the state may satisfy its burden by demonstrating that the undercover officer would return to an area of operation where the trial audience might reside, so long as that area is defined with geographic particularity. *See Brown v. Andrews,* 180 F.3d at 406–407; *Brown v. Kuhlmann,* 142 F.3d at 537; *Nieblas,* 204 F.3d at 33. With respect to safety, where the testimony of the undercover detective is crucial to the case, the state must demonstrate a specific connection between the perceived threat to the officer and the officer's public testimony in the particular proceeding. *See Bobb,* 196 F.3d at 353; *Brown v. Andrews,* 180 F.3d at 407–408. This particular requirement is met if the state credibly asserts: (1) a reasonable relationship between the danger to the officer and the presence in court of associates of the defendant; (2) a plausible fear, in view of the existence of other pending proceedings concerning parties with whom the officer is also involved as an undercover agent, so long as those proceedings are in the same courthouse; or (3) a specific threat to the officer that would be aided by the officer's open testimony. *See Bobb,* 196 F.3d at 353–354; *Brown v. Andrews,* 180 F.3d at 408.

▇ In the instant case, the prosecutor sought to close the courtroom during the police officer's testimony, claiming a threat to his personal safety and effectiveness as an undercover officer, and the witness expressed concerns about both issues. (Tr. at 115, 119.) Laieta was an active undercover officer, with more than twenty-five open cases in the area of Stanton Street and Clinton Street, the same area where petitioner had been arrested after selling drugs to Officer Laieta. (Tr. at 120–121.) Moreover, Laieta would be returning to that area to continue his undercover work during the week of the trial, and he testified that if someone saw him who frequented that area, and they informed drug dealers of his identity, something could happen to him and his work would clearly

be impeded. (Tr. at 119.) *Compare Brown v. Andrews,* 180 F.3d at 408 (no overriding interest in safety and effectiveness where detective feared exposure *generally* throughout Manhattan). Furthermore, Laieta testified that "a large part of [the operations he was involved in], I would say, are still outstanding." (Tr. at 118.)

These facts satisfied the People's burden in demonstrating that the substantial interest in maintaining the effectiveness of the undercover officer would be jeopardized by requiring him to testify in open court. (Tr. at 121–122). *Cf. Miranda v. Keane,* No. 97 Civ. 1129(JSR)(RLE), 1998 WL 182449, at *1 (S.D.N.Y. Apr. 17, 1998) (trial court's finding that officer was still "engaged in continuing undercover work in the very same area as the scene of the prior undercover work involving petitioner" was sufficient to justify closing the courtroom); *Aguayo v. Headley,* No. 96 Civ. 2918(JAK), 1997 WL 217589, at *3 (S.D.N.Y. May 1, 1997) (interest of law enforcement agency in maintaining cover and effectiveness of agents is sufficient to satisfy first prong [of *Waller*]).

*B. The closure was no broader than necessary to protect the interest demonstrated by the state*

▇ The second prong of *Waller* is satisfied when the trial court narrowly tailors the closure. "Closure of the courtroom during the testimony of a single witness is itself a narrow alternative to closure for the duration." *Brown v. Kuhlmann,* 142 F.3d at 538; *see also Bowden,* 85 F.Supp.2d at 250–51. In this case, all portions of petitioner's trial, other than the testimony of Officer Laieta, were open to the public, including the testimony of Officer Warner, of the prosecution's chemists, Dr. Megalla and Dr. Bishara, of petitioner, and of petitioner's chemist, Dr. Solomon. *Cf. Pastrana,* 1999 WL 1129050, at *5 (closure was narrowly tailored where it was limited to the testimony of the undercover detective). Moreover, even during the undercover's

testimony, members of petitioner's immediate family were permitted to remain in the courtroom.

Accordingly, the limited closure of the courtroom for Laieta's testimony was no broader than necessary to protect his safety and effectiveness.

*C. Consideration of reasonable alternatives to closing the courtroom*

■ In *Ayala III,* the Second Circuit held that closure of the courtroom during the testimony of a single witness is itself a narrower alternative than closure for the duration of the proceeding. *See Ayala III,* 131 F.3d at ·71. Thus, as in this case, because the closure was only partial, the trial court was not under an obligation to consider other alternatives *sua sponte. See Ayala III,* 131 F.3d at 71; *see also Brown v. Kuhlmann,* 142 F.3d at 538; *Campbell v. Sabourin,* 37 F.Supp.2d 601, 604 (E.D.N.Y.1999).

In this case, defense counsel objected to closure generally, but did not propose any alternatives to closure; nor did defense counsel specifically request that petitioner's family and friends be permitted to remain in the courtroom. *Cf. Brown v. Kuhlmann,* 142 F.3d at 538 (where defendant did not request that his family members be permitted to remain in the courtroom, he cannot argue·that their exclusion renders the closure overbroad). In any event, the trial court, *sua sponte,* did allow any members of petitioner's immediate family who were present, to remain in the courtroom during Laieta's testimony. (Tr. at 123.) *Cf. Garcia v. Lewis,* 188 F.3d 71, 79–81 (2d Cir.1999) (affirming denial of habeas relief where trial court closed courtroom, but permitted petitioner's mother to remain); *Houston v. McGinnis,* No. CV–97–6862, 1999 WL 1129613, at *6 (E.D.N.Y. Oct.13, 1999) (denying petitioner's claim of a violation of his right to a public trial where defense counsel neither objected to complete closure of courtroom, nor requested that members of petitioner's immediate family be permitted to remain in the courtroom); *compare Vidal v.*

*Williams,* 31 F.3d 67, 69 (2d Cir.1994) (granting writ of habeas corpus where defendant's parents were excluded during testimony of undercover officer); *English v. Artuz,* 990 F.Supp. 156, 158 (E.D.N.Y. 1998) (granting habeas relief where trial court refused to allow petitioner's family to remain in courtroom during undercover officer's testimony, without giving adequate findings to support the closure).

Because the judge only partially closed the courtroom and permitted petitioner's family to remain in the courtroom, the trial court satisfied the third prong of the *Waller* test.

*D. Findings adequate to support the closure*

■ Under *Waller's* fourth prong, the trial court must make findings adequate to support the closure of the courtroom. What is required are findings "specific enough [so] that a reviewing court can determine whether the closure order was properly entered." *Press–Enterprise Co. v. Superior Court of California, Riverside County,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984); *see also Woods v. Kuhlmann,* 977 F.2d at 77; *Soto v. Reynolds,* 64 F.Supp.2d 331, 336 (S.D.N.Y.1999)("The ultimate question ... is whether the findings made [by the trial court] adequately demonstrate the court's consideration of the factors *Waller* dictates."). As the Second Circuit explained, "the strength of the judge's findings [under the fourth prong of *Waller* ] must be evaluated by reference to the ... scope of the closure they support." *Brown,* 142 F.3d at 538. Where the closure is limited, the scrutiny given the findings is correspondingly less. *Id.* Thus, in *Brown,* although the Second Circuit found "the reasons [a judge gave for closing a courtroom] ... neither entirely accurate nor particularly compelling," it nonetheless concluded that "the trial court's findings were adequate" to support a limited closure. *Id.*

■ In the instant case, the trial court conducted an evidentiary hearing, heard

arguments by the prosecution in favor of courtroom closure on the grounds of both safety and effectiveness, and made explicit findings of fact that Laieta "has a legitimate fear for his safety;" that Officer Laieta was engaged in ongoing undercover investigations in the same limited geographical area where petitioner had operated; that Officer Laieta had "some 25 cases which have not yet been disposed of;" and that "[Laieta] expects to return back to that area sometime this week [during the trial]." (Tr. at 121.) The trial court further found that "should someone actually recognize [Laieta] here in court, it would definitely pose a risk to his life and limb, because of the nature of his job and his assignment to that particular area [where petitioner had been arrested]." (Tr. at 122.) Based on these findings, the trial court concluded that limited closure of the courtroom during the testimony of Laieta (permitting any members of petitioner's family to be present) was appropriate because of Laieta's safety concerns; the trial court did not explicitly address the interest asserted by the People in preserving Officer Laieta's effectiveness.

To justify closing the courtroom on the basis of safety, the prosecution must show a specific connection between a perceived threat to the officer and the officer's public testimony in the particular proceeding. *See Bobb*, 196 F.3d at 353; *Brown v. Andrews*, 180 F.3d at 407–408. To justify closure of the courtroom on the basis of effectiveness, the prosecution must show that the officer will return to a particular geographical area where the trial audience resides. *See Brown v. Andrews*, 180 F.3d

at 406–407; *Brown v. Kuhlmann*, 142 F.3d at 537.

The trial court made findings of fact as to Laieta's credibility, the nature of his ongoing undercover work, and the likely effect of his public testimony at trial on his ongoing undercover work. The trial court found that Laieta was engaged in ongoing undercover operations in the same limited geographical area where petitioner had been arrested. Although the court's ultimate conclusion—that concern for Officer's Laieta's safety merited the closing of the courtroom—does not comport with the standards set forth by the Second Circuit for closure on the basis of safety, *see* discussion at page 377 *supra*, the court's findings fit precisely under the standards articulated by the Second Circuit to justify the limited courtroom closure in this case, on the basis of preserving Laieta's effectiveness.[9] Moreover, in a situation of limited courtroom closure, "information gleaned" from the record will help satisfy the fact-finding requirement under *Waller*. *See Woods v. Kuhlmann*, 977 F.2d at 77–78; *Bowden v. Keane*, 85 F.Supp.2d at 251. "The crucial question is whether the circumstances justified the closure." *Gonzalez v. Quinones*, 211 F.3d 735, 738 (2d Cir.2000).[10]

Here, the trial court's findings, combined with the hearing testimony in the record, are sufficient to allow this Court to confirm that the limited closure of the courtroom in this case was appropriate. *Cf. Nieblas*, 204 F.3d at 33 (where the evidence before the district court demonstrated that the undercover officer would return to work at the site where the defendant engaged in drug trafficking, court-

---

9. The Court notes that petitioner's trial occurred in 1995, several years prior to the Second Circuit's decision in *Ayala III* and its progeny, which have explicated the distinctions between the state's interests in "safety" and "effectiveness."

10. In *Gonzalez*, the People did not have an opportunity to develop the record on the need for closure and the trial court did not make findings on closure because of unusual circumstances. Nevertheless, the Second Circuit concluded that the district court had discretion to hold a reconstruction hearing to determine whether the People could show that there had been sufficient justification to close the courtroom, consistent with *Waller*. In this case, there is no need for such a hearing because the People did present evidence and sufficient justification at the trial for the partial closure of the courtroom.

room closure was appropriate to preserve the effectiveness of the officer, even though the state trial court did not have the opportunity to consider and rule upon that evidence and it simply closed the courtroom in the interest of the safety of the officer); *Bowden*, 85 F.Supp.2d at 251 (holding that courtroom closure was appropriate, despite limited fact finding by trial court, because the testimony during the closure hearing was adequate to support closure); *Soto*, 64 F.Supp.2d at 338 (Court denies habeas relief where, "[a]lthough findings made by the state court might have been more detailed, they were adequate to demonstrate that [the court] considered the relevant legal factors and found them satisfied. The findings were thus sufficient to permit review and to support closure of the courtroom in petitioner's case."); *Miranda v. Keane*, No. 97 Civ. 1129(JSR), 1998 WL 182449, at *1 (S.D.N.Y. Apr.17, 1998), *aff'd*, 189 F.3d 461, 1999 WL 568025 (2d Cir.1999)(denying habeas relief where the trial court closed the courtroom on general ground that "there is a law enforcement need" because the court's conclusion was premised on a finding of continuing undercover work by the witness in the same location as the scene of the crime, which is "precisely the kind of finding that the Second Circuit found to justify courtroom closure"). *Compare Guzman v. Scully*, 80 F.3d 772, 776 (2d Cir.1996)(granting habeas relief where trial court heard no witnesses or argument, but simply heard statements by counsel and relied on unsubstantiated facts

by prosecutor, in deciding to close the courtroom); *Mason v. Schriver*, 14 F.Supp.2d 321, 325 (S.D.N.Y.1998)(granting habeas relief where trial court closed the courtroom with only a conclusory statement, and failed to make any findings to support the closure).

\* \* \* \* \* \*

In sum, the facts adduced at the hearing were sufficient under *Waller* and *Ayala III* to support the partial closure of the courtroom during petitioner's trial. Moreover, the Appellate Division, in affirming petitioner's conviction, noted that "[t]he court properly closed the courtroom during the undercover officer's trial testimony, since he was actively engaged in pending undercover operations in the specific area of defendant's arrest," and that "since defense counsel never suggested any alternatives to closure, the trial court was not required to do so." *Cadilla*, 666 N.Y.S.2d at 112. In view of the discussion above, it is clear that the Appellate Division's determination was neither "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," nor "contrary to, [n]or ... an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Thus, there is no basis to grant petitioner habeas relief on the issue, and I respectfully recommend that this claim be dismissed.[11]

## CONCLUSION

For the above reasons, I respectfully recommend that the petition for a writ of

---

**11.** Even if the Court were to conclude that the trial court's findings were deficient because the court relied on the "safety" factor rather than preserving the effectiveness of the undercover officer, habeas relief would not be the appropriate remedy in this case. The Second Circuit has warned that courts "should proceed with some caution before ordering such disproportionate relief in a case in which the trial judge did not 'deliberately enforce secrecy in order to be free of the safeguards of the public's scrutiny,' ... and in which the error is not of 'the sort that risks an unreliable trial outcome and consequent conviction of an in-

nocent person.'" *Brown v. Kuhlmann*, 142 F.3d at 539 (internal citations omitted); *see also Brown v. Andrews*, 180 F.3d at 409, n. 4; *Nieblas*, 204 F.3d at 32 (court endorses habeas court's ability to conduct fact-finding rather than granting petitioner the "windfall" of a new trial, where the alleged constitutional violation does not affect the fairness of the outcome of the trial). Here, the trial court at most made a good-faith error in articulating the ultimate reason for closing the courtroom, although the closure of the courtroom itself was appropriate in light of the testimony at the hearing and the fact-finding of the trial court.

habeas corpus be denied and that the action be dismissed with prejudice. As the petition presents no question of substance for appellate review, I recommend that a certificate of appealability not be issued. *See Reyes v. Keane,* 90 F.3d 676, 679 (2d Cir.1996). I further recommend that the Court certify pursuant to 28 U.S.C. § 1915(a), that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Sidney H. Stein, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Stein. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

Sept. 11, 2000.